# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2

 3    BRACHA POLLAK,                )
              Plaintiff,             )
 4                                   )   CIVIL NO.
         v                           )
 5                                   )   3:15-cv-4025-FLW-
      PORTFOLIO RECOVERY             )   DEA
 6    ASSOCIATES, L.L.C., and        )
      JOHN DOES 1-25,                )
 7            Defendant.             )
                                     )
 8

 9

10        Deposition of Susan Guevara, taken before

11    Melinda Crowling, court reporter, notary public

12    No. 192991 for the Commonwealth of Virginia at Large,

13    pursuant to notice, at the offices of Troutman

14    Sanders, 222 Central Park, Suite 2000, Virginia

15    Beach, Virginia, scheduled for 12:00 noon and

16    commencing at 12:35 p.m., May 23, 2016, to be used in

17    the trial of the above-entitled cause.

18

19                     -----oOo-----

20

21         APPEARANCES: Marcus Zelman (Mr. Yitzchak
                        Zelman), attorneys for the
22                      plaintiff.

23                      Troutman Sanders (Mr. David N.
                        Anthony), attorneys for the
24                      defendant.

25
```

S. Guevara                              5

1  Q    When you say managing the letter
2  process, are we talking about collection letters
3  here?
4  A    Yes.
5  Q    Let's back up for a second. PRA, what
6  is their principal business?
7  A    PRA, LLC, is the buying arm of PRA
8  Group. So I work for PRA, LLC, which is the debt
9  buyer.
10 Q    So you're talking about Portfolio
11 Recovery Associates, LLC, is the debt buyer?
12 A    Yes.
13 Q    Is there another branch of the company?
14 A    Well, they have other -- There's other
15 subsidiaries of PRA Group.
16 Q    Okay. Before coming here today, have
17 you reviewed any documents or materials in
18 preparation for today's deposition?
19 A    Yes.
20 Q    And I'm not asking you about what you
21 spoke about with your attorney. Obviously that would
22 be covered by attorney-client privilege. But what
23 documents did you look at?
24 A    I looked at some policies and procedures
25 documents, and then I looked at the account records

S. Guevara                              6

1  for the client or the customer.
2  Q    We'll go through the account records in
3  this deposition, but what policies and procedures did
4  you look at?
5  A    We have litigation department
6  procedures.
7  Q    Do you have that here today?
8  A    No.
9  Q    When you say you have litigation
10 department procedures, what are we talking about? A
11 book? A pamphlet? A one-sheet piece of paper?
12 A    It's a word document. I think it's PDF
13 form actually.
14 Q    How big approximately in page numbers?
15 A    It's probably about ninety pages.
16 Q    Okay. And I haven't seen this document.
17 Obviously I'm going to request it following today's
18 deposition. But can you tell me briefly what it's
19 about? What is it? What did that give you, if
20 anything?
21 A    It's actually a training guide. I might
22 have called it a policies and procedures, but I think
23 it's called a training manual, a litigation
24 department training manual. It's for the call center
25 agents that work in the litigation department, and it

S. Guevara                              7

1  just sets forth the rules and requirements that they
2  have to follow when they're working the accounts that
3  are in the litigation department.
4  Q    Are we just talking people managing the
5  call center or collectors in general?
6  A    It's for just people in the litigation
7  department call center.
8  Q    Is there a separate call center for the
9  litigation department?
10 A    Yes.
11 Q    Okay. Now, is everybody in the
12 litigation department in the call center technically
13 of that department? Can anybody in the litigation
14 center make calls on an account?
15 A    But only on the accounts that are placed
16 in the litigation department.
17 Q    Right. Okay. So that was my question.
18 I'm going to try to clarify it again.
19 A    Okay.
20 Q    I understand you have roughly 280
21 people in the litigation department. Is that
22 accurate?
23 A    Sounds about right. Yes.
24 Q    And how many of those people are in the
25 call department?

S. Guevara                              8

1  A    I believe -- I think if I saw the answer
2  we gave, that has the exact number. I believe that's
3  the number of agents. And then there's some number
4  of attorneys over and above that number.
5  Q    If I recall correctly, I believe PRA in
6  its responses to discovery identified 280 employees
7  of the litigation department, and of those 54 were
8  attorneys.
9  A    Okay. Then that's --
10 Q    Does that --
11 A    That's what it is.
12 Q    So are you saying that of those 280
13 people, of the 54 who are attorneys, the rest are in
14 the call center?
15 A    Yes.
16 Q    I understand. Okay.
17      Other than the policies and procedures
18 document we just discussed and my client's account
19 notes or records, did you review any other documents?
20 A    I reviewed what's called a user guide
21 that's published by the information technology
22 department that discusses the systemic process that's
23 used to place accounts into the legal workflow.
24 Q    Okay.
25 A    It's a technical guide.

S. Guevara    25

1  correct?
2       A    No.  It says, Your first payment must be
3  received in our office no later than January 5, 2015.
4       Q    Okay.
5       A    Unless I'm looking at it wrong.  Yeah.
6       Q    Do you know approximately when that
7  letter was mailed to my client?
8       A    Well, it's dated December 8th, 2014.
9       Q    Is it PRA's practice to mail it the same
10 day it's dated?  The day after?  I mean how does that
11 work?
12      A    Well, a file is sent to the letter
13 vendor, and then it's dated the day that they print
14 and mail it.  So it would have been put in the mail
15 on the 8th.
16      Q    I understand.  Okay.  So this letter
17 goes out to my client on December 8th.  And it says
18 the first payment needs to be received by January 5,
19 2015.
20      A    Yes.
21      Q    Do you know if a payment was received
22 before January 5, 2015?
23      A    There was no payment received.
24      Q    And again is there something in PRA's
25 computer system or scheduling that tells PRA, hey, no

RONALD GRAHAM AND ASSOCIATES, INC
Virginia Beach, Virginia
Phone (757) 490-1100

S. Guevara    26

1  payment was received, it's time to send another
2  letter?
3       A    What happens is thirty days after this
4  letter is sent out, if the account is still in the
5  legal department and no payment has been received, it
6  will send the LL2 letter.
7       Q    What is the LL2 letter?
8       A    It would have been the other exhibit you
9  have.  Should be the other letter you have.  The
10 second notice.
11           MR. ZELMAN:  All right.  So we'll mark
12      that as Plaintiff's Exhibit C.
13           (Marked by the court reporter as
14      Exhibit C.)
15
16 BY MR. ZELMAN:
17      Q    And I'm just going to hand that to you.
18 And that's a collection letter mailed by PRA to my
19 client dated January 6, 2015.  Is that the LL2 letter
20 you were referring to?
21      A    Yes.  It has the code right above the
22 address box.
23      Q    Oh, I see.
24      A    Yeah.  That's how we know what it is.
25      Q    I got you.  Okay.  Now, in between

RONALD GRAHAM AND ASSOCIATES, INC
Virginia Beach, Virginia
Phone (757) 490-1100

S. Guevara    27

1  sending out -- Let me backtrack for a second.  If
2  that's the LL2 letter, am I correct in assuming that
3  what's been marked Exhibit B is an LL1 letter?
4       A    Yes.
5       Q    So between sending out the LL1 letter
6  and the LL2 letter, I mean did anybody at PRA review
7  my client's file to determine whether another letter
8  should go out or was it just automatic, no payment is
9  received, LL2 letter goes out?
10      A    It's a systemic process that's thirty
11 days from the date of the first -- or -- Yeah.
12 Thirty days from the date of the first letter, it's
13 triggered by a systemic process based on there being
14 no payments on the account and the account still
15 being in a legal status.
16      Q    I understand.  And then there is a third
17 letter issued on this account; is that correct?
18      A    Not to my knowledge.
19           MR. ZELMAN:  Let me make sure I'm not
20      making a terrible mistake.  Let's mark this as
21      Plaintiff's Exhibit D.
22           (Marked by the court reporter as
23      Exhibit D.)
24
25

RONALD GRAHAM AND ASSOCIATES, INC
Virginia Beach, Virginia
Phone (757) 490-1100

S. Guevara    28

1  BY MR. ZELMAN:
2       Q    I'm going to ask you to take a look at
3  this letter, which is dated January 6, 2015.
4       A    It's the same letter as the --
5       Q    It is the same letter, right?
6       A    Uh-huh.
7       Q    It just looks very different for some
8  reason.
9       A    It's photocopied bigger.
10           MR. ANTHONY:  For the record, could you
11      say as to which one it's the same as?
12           THE WITNESS:  Oh.  So Exhibit C is the
13      same as Exhibit D.  And there's codes at the
14      top of the Exhibit D that if you had the same
15      codes on C, the way it was photocopied you
16      could actually match it up and tell exactly.
17      But it's the same exact letter.
18
19 BY MR. ZELMAN:
20      Q    So C and D are the same?  It's just
21 that's a weird photocopy of that, right?
22      A    That's right.
23      Q    I wasn't sure about that, so that
24 clarifies that.  Excellent.
25           One moment.

RONALD GRAHAM AND ASSOCIATES, INC
Virginia Beach, Virginia
Phone (757) 490-1100

S. Guevara                                                          29

1            Okay. Now, PRA sends LL1, and it says
2   first payment must be received by January 5, 2015.
3   No payment is received. PRA sends LL2 giving a
4   deadline of -- was it February 5th, 2015?
5        A    Yes.
6            MR. ANTHONY: Object to the form of the
7        question.
8
9   BY MR. ZELMAN:
10       Q    Well, here is the question. The
11  question is was there a payment received before
12  February 5, 2015?
13       A    No.
14       Q    What, if anything, happened on the
15  account after that date?
16       A    After which date?
17       Q    After February 5, 2015.
18       A    That's pretty broad. I'm not sure what
19  you're asking.
20       Q    Okay. I can narrow it down for you.
21           You said thirty days after that first
22  letter went out, systemically another letter goes out
23  if no payment is received. Correct?
24       A    Correct.
25       Q    Is there another systemic follow-up of

S. Guevara                                                          30

1   any sort thirty days after LL2?
2        A    Sixty days after the LL2, the account is
3   considered eligible for legal placement with an
4   attorney. And then this account I believe was placed
5   in March of 2015 with an attorney for suit.
6        Q    Do you know what date in March?
7        A    I don't remember the exact date, but you
8   have it in the account notes. If you want to show me
9   the notes, I can show you where it is.
10       Q    Sure. And that would be sixty days
11  after the letter was issued, so that would be sixty
12  days after January 6, 2015?
13           MR. ANTHONY: Object to the form of the
14       question.
15       A    It's a systemic process, so it could be
16  plus or minus a few days, but generally that's the
17  rule, sixty days.
18       Q    Okay. I know we're skipping around here
19  a lot, but I'd rather just keep a flow of the
20  questions going, so I will hand you the account
21  notes.
22       A    Okay.
23           MR. ZELMAN: Let's mark this as --
24       I guess we used D for no good reason, so
25       let's --

S. Guevara                                                          31

1            (Discussion off the record concerning
2        marking of exhibits.)
3            MR. ANTHONY: And just for the record,
4        Exhibit B is marked as PRA Pollak 000020 to
5        -21.
6            Exhibit B is marked PRA -- Exhibit C is
7        marked PRA Pollak 000022 to -23.
8            And Exhibit D is not marked with a PRA
9        Bates label number.
10           (Exhibit E was marked by the court
11       reporter.)
12
13  BY MR. ZELMAN:
14       Q    So I'm going to hand you what's been
15  marked as Plaintiff's Exhibit E, which appear to be
16  the account notes from my client's records. It's PRA
17  000029 through -31. I know there was two versions of
18  these issued, so these are the unredacted notes.
19           Are those the account notes you were
20  referring to?
21       A    Yes.
22       Q    Looking at those, does that tell you
23  what date my client's account was referred for -- as
24  eligible for litigation?
25       A    February --

S. Guevara                                                          32

1            MR. ANTHONY: Object to the form of the
2        question.
3        A    February 18, 2015, it was placed in
4   our -- placed with an attorney. Well, actually
5   February 17th. The note is dated February 18th.
6   It's a little lag in how the notes get updated. But
7   that's when it was placed with an attorney.
8
9   BY MR. ZELMAN:
10       Q    And where do you see that on there?
11       A    Here. (Indicating)
12       Q    What are you pointing to? Let me see.
13       A    Acknowledgement. PDATE. 2-17-15.
14  XLOADED. Account loaded in CLS.
15       Q    And what does that mean?
16       A    That means it was loaded in our what's
17  called CLS. I'm not quite clear what that acronym
18  is, but it's where accounts go when they're ready to
19  be placed with an attorney for review.
20       Q    Do you know why it was placed on that
21  date?
22       A    It's about sixty days from that LL2
23  date.
24       Q    I thought the LL2 date is January 5,
25  2015.

```
                                    S. Guevara                33
```

1  A    February, March. So it's a little bit
2  earlier. Yeah. I'm not sure.
3      Q    Do you know if there was a particular
4  reason why it was placed earlier than the sixty days
5  or does it just happen from time to time?
6      A    No. It's whenever the process is ran.
7      Q    Okay. And what happens when a
8  collection account is placed with the -- Well, it was
9  already placed with the litigation department; is
10 that correct?
11     A    Prior to that, yes.
12     Q    But on this date it just becomes
13 eligible for litigation?
14     A    Well, it gets --
15         MR. ANTHONY: Objection to the form of
16     the question.
17         Go ahead.
18     A    It gets assigned to an attorney for
19 review.
20
21 BY MR. ZELMAN:
22     Q    Did it get assigned to an attorney on
23 February 17th?
24     A    Yes.
25     Q    Do your account notes tell you which

```
              RONALD GRAHAM AND ASSOCIATES, INC
                    Virginia Beach, Virginia
                      Phone (757) 490-1100
```

```
                                    S. Guevara                34
```

1  attorney that was?
2      A    No.
3      Q    Do you have anything that would tell you
4  which attorney that was?
5      A    Well, if you -- on the PRAnet page, the
6  screen shots, you would need the history of what's
7  called the responsibility, and it shows codes for
8  what firm it would have gone to, whether it was
9  internal or external.
10     Q    So I have what I think you're
11 referring to, and I'm going to mark it as Plaintiff's
12 Exhibit F. And I'll give it to you to see if what
13 you're referring to is on there. I'm not sure that
14 it is.
15         (Exhibit F was marked by the court
16     reporter.)
17
18 BY MR. ZELMAN:
19     Q    So I'm handing you what's been marked
20 Plaintiff's Exhibit F. It appears to be the PRAnet
21 records. It's marked PRA Pollak 000014 through -16.
22         Are those the documents you're referring
23 to?
24     A    Yes. TWACLS means it's an internal
25 attorney.

```
              RONALD GRAHAM AND ASSOCIATES, INC
                    Virginia Beach, Virginia
                      Phone (757) 490-1100
```

```
                                    S. Guevara                35
```

1      Q    Do you know which one?
2      A    Specifically I can't remember the
3  attorney's name.
4      Q    Is there anything that would refresh
5  your recollection as to which attorney that was?
6      A    There's nothing here.
7      Q    And do you have anything in your office
8  or in PRA's records which would provide that name?
9      A    Yes.
10     Q    And what would that be?
11     A    Well, I think we could just check with
12 the managing attorney for this region and ask which
13 attorney worked on the case.
14     Q    And who is the managing attorney for
15 this region?
16     A    I don't remember the name.
17     Q    Okay. So just going back -- I think we
18 got a little sidetracked trying to identify this
19 attorney -- but I asked you whether the account was
20 referred to an attorney on February 17th. You
21 identified that it was.
22         My next question to you is then when was
23 a decision made to file a suit on this account?
24     A    On March 18th, it was -- the attorney
25 approved the account for suit. Actually on

```
              RONALD GRAHAM AND ASSOCIATES, INC
                    Virginia Beach, Virginia
                      Phone (757) 490-1100
```

```
                                    S. Guevara                36
```

1  March 17th. The note posted on March 18th.
2      Q    And do you know which attorney approved
3  it for suit? Or it's the same?
4      A    I don't remember off the top of my head.
5      Q    Okay. Would it be the same attorney who
6  was assigned to it on February 17th?
7      A    I'm not sure.
8      Q    Do you know when suit was actually filed
9  on this account?
10     A    I would have to say it was the end of
11 March because that's when the court fees were posted,
12 but I am not sure if I could tell the exact date off
13 of these notes. But it would have been the end of
14 March. March 31st is when the court fees were
15 drafted.
16     Q    What does that mean when the court fees
17 were drafted?
18     A    Well, presumably to file the suit. It
19 would have been the court costs. Right?
20     Q    Are you saying March 30th is the date
21 that the check was issued to pay for the court costs?
22     A    That's what it looks like, yes.
23 March 31st.
24     Q    Can I just get the top page back for one
25 moment? I just note that there is an entry on here

```
              RONALD GRAHAM AND ASSOCIATES, INC
                    Virginia Beach, Virginia
                      Phone (757) 490-1100
```

S. Guevara                                      37

1   dated April 3, 2015, which says file fee, file suit.
2   Do you see that?
3       A    Yes.
4       Q    What, if anything, does that tell you?
5       A    I'm not sure.  That could have been the
6   actual date.  I mean that's within four days.  There
7   could have been a weekend in there.  I'm not sure.
8       Q    Okay.
9       A    So it would have been possibly the very
10  beginning of April.
11      Q    Do you know the date that a lawsuit was
12  actually filed on this account?
13      A    No.
14      Q    Okay.  As part of your duties and
15  responsibilities as AVP of Portfolio Strategy, do you
16  ever review court records?
17      A    No.
18      Q    As part of your review of the file for
19  today's deposition, did you review my client's court
20  records?
21      A    No.
22      Q    Are you an attorney?
23      A    No.
24      Q    Prior to preparing for today's
25  deposition, have you reviewed my client's file in

S. Guevara                                      38

1   the past?
2       A    Other than to prepare for the
3   deposition, no.
4       Q    Okay.  According to the account notes
5   in front of you, did anybody review my client's file
6   in between LL2 and LL1 being issued, that thirty-day
7   period in between?
8       A    This didn't have any notes, so I would
9   say no.
10      Q    Did anybody review the file before LL1
11  was issued?
12      A    What do you mean review the file?
13      Q    Meaning -- I'm trying to drill down to
14  how the decision was made to issue the LL1 letter on
15  my client's account.  Do you know if there was some
16  sort of decision-making process at PRA that would
17  result in LL1 being issued?
18      A    There's a systemic process that results
19  in it being issued.
20      Q    What does that mean?
21      A    So accounts are selected for legal
22  collections.  This was placed in legal collections on
23  December 5th, and as a result of that the LL1 was
24  sent.
25      Q    And when you say legal collections, it

S. Guevara                                      39

1   was in collections with PRA before that date; is that
2   correct?
3       A    Correct.
4       Q    And I'm assuming those weren't illegal
5   collections, so my question is what does it mean
6   being assigned to legal collections?
7       A    Legal with a capital L.  So litigation
8   department.
9       Q    Okay.  And do you know who made the
10  decision to transfer my client's file to the Legal,
11  with a capital L, department?
12      A    There's not a person that individually
13  makes a decision on individual accounts.  So it's a
14  systemic process that selects the accounts and places
15  them into legal.
16      Q    How does that happen?
17      A    So accounts are scored, and then based
18  on their eligibility for meeting the balance and
19  other criteria for legal collections, they're placed
20  into a legal status.
21           In Exhibit F you'll see status LEGL.
22  That denotes legal status.  And at that point,
23  they're in a prelitigation stage, and they're sent
24  the LL1 and the LL2 letter.  And then if no payments
25  are received, that's when it will get assigned to an

S. Guevara                                      40

1   attorney.
2       Q    Okay.  Do you know how long my client's
3   file was with PRA before it was assigned to the legal
4   department?
5       A    Oh, here it is.  It was purchased
6   August 25th of 2014.
7       Q    That's when it was purchased.  Do you
8   know when PRA actively started trying to collect it
9   either through calls or letters?
10      A    It would have been approximately the
11  end of September 2014.  First we send an initial
12  notice letter, and shortly thereafter we'll commence
13  calling and lettering the account for collection.
14      Q    Okay.  So my client's account is in
15  collections from September 2014.  And in December
16  of 2015, it gets transferred to the -- well, not
17  December 2015.  December 2014 it got transferred to
18  the legal department, right?
19      A    Yes.
20      Q    How often does the system make this
21  analysis of, All right, this meets the criteria to
22  transfer it to the legal department, let's transfer
23  it?
24      A    Twice a month.
25      Q    Okay.  So it was in collections for

S. Guevara                                                   41

1  about three months, and then the system decided,
2  Let's send this to the legal department?
3     A    Correct.
4     Q    And there was no human involvement in
5  that other than the system?
6     A    Well, there's people who, you know, run
7  scripts that perform the mechanical aspect of it.
8     Q    Right. Okay. No attorney looked at the
9  file and said, Let's send this to the legal
10 department; is that correct?
11    A    That's correct.
12        MR. ZELMAN: Okay.
13        Okay. Let's mark this as -- what are
14 we up to?  G? -- Plaintiff's Exhibit G.
15 This is the Defendant's Responses to
16 Plaintiff's First Set of Interrogatories.
17 Okay?  It doesn't have a Bates stamp.
18        (Marked by the court reporter as
19 Exhibit G.)
20
21 BY MR. ZELMAN:
22    Q    So I'm going to hand this to you to take
23 a look at.
24    A    Okay.
25    Q    Take a moment to look through the

S. Guevara                                                   42

1  document because it's kind of extensive, but just
2  have you seen this document before?
3     A    Yes.
4        MR. ANTHONY: And for the record is it
5     all the pages?
6        MR. ZELMAN: Yeah. We're not going to
7     go through all of them, but it's here for sake
8     of completeness.
9
10 BY MR. ZELMAN:
11    Q    Have you had a chance to look through
12 the document?
13    A    Yes.
14    Q    Excellent. Let me have it for one
15 moment and I'll point you in the right direction
16 here.
17        Interrogatory 18 requested that the
18 defendant state the defendant's policies that are
19 involved in making the decision to institute a
20 collection lawsuit on a specific collection account.
21        In response, it's an extensive two-
22 page response, but it gives a number of factors
23 that PRA considers including the amount of the
24 underlying debt at issue, whether the action is
25 within the applicable statute of limitations and

S. Guevara                                                   43

1  so on.
2        I'm going to give it to you to look at
3  so you know what I'm talking about.
4        My question is there's like over
5  fifteen factors over there that go into the
6  consideration of whether a particular account should
7  be sent to be sued upon. If you can just look at
8  that. Does that seem accurate to you? These
9  different categories? Is this the factors that go
10 into consideration?
11    A    Yes.
12    Q    Okay. And so my next question to you
13 is LL1 goes out. Right? And we have all these
14 factors that are considered whether we sue or not.
15 Does anybody get sued after LL1 goes out before LL2
16 goes out?
17    A    To the first part of what you said,
18 these factors go into deciding whether the account
19 gets placed in legal, which causes the LL1 to go
20 out. And then do people get sued after the LL1?
21 The answer would be no. I mean we try to give at
22 least two chances to work something out.
23    Q    Okay. Just to clarify one thing you
24 just said. Can you read the Interrogatory 18. Not
25 the response. The two-line interrogatory.

S. Guevara                                                   44

1     A    Okay.
2     Q    Do you see where it says 18?
3     A    Uh-huh. Yes.
4     Q    My understanding of what the
5  interrogatory asked is, State what factors go into
6  consideration of whether to sue on a specific
7  account.
8     A    Correct. But it's the same
9  consideration that we use to put them into legal
10 to begin with, because if we can't sue them then we
11 wouldn't put them in legal.
12    Q    I understand that, but here's the
13 question I'm asking. All these factors go into
14 consideration of whether to put them in the legal
15 department or not, right?
16    A    Correct.
17    Q    And then these factors are again
18 considered before actually filing suit? Is that what
19 you're saying?
20    A    Correct.
21    Q    So do you have files that after
22 consideration of these factors get assigned to
23 the legal department but don't pass the test to
24 get sued?
25    A    There's a couple things that would

S. Guevara                                        45

```
 1  result in someone not getting sued.  They could
 2  work out payment arrangements prior to suit.  They
 3  could file for bankruptcy.  We could be notified
 4  they're deceased.  They could, you know, move.  We
 5  could have mail returned and we don't know where
 6  they're at.  And then the attorney as well is
 7  looking at that file to determine if it's suit
 8  eligible.  Ultimately the attorney makes that
 9  decision based on the factors they have in front of
10  them at the time.
11       Q    Okay.  And so going back to my earlier
12  question now that you clarified that response, the
13  system systemically analyzes whether someone should
14  be sent to the legal department; and then if it
15  determines it should, it issues LL1, correct?
16       A    Correct.
17       Q    And after LL1 expires, the system will
18  systematically send LL2?
19       A    Correct.
20       Q    And just to clarify, in between LL1
21  and LL2 the system will never stop the system and say
22  we're going to sue now; is that correct?
23            MR. ANTHONY:  Object to the form of the
24       question.
25       A    No.  I mean -- I'm sorry.  Can you
```

S. Guevara                                        46

```
 1  repeat that?
 2
 3  BY MR. ZELMAN:
 4       Q    If I didn't clarify it right -- Okay.  I
 5  believe you answered it, but it wasn't clear because
 6  there was confusion about what Interrogatory 18 was
 7  asking, so I'm going to ask it again.
 8            If somebody doesn't make their payment
 9  by the time LL1 expires, the system will send out
10  LL2, correct?
11       A    Correct.
12       Q    Does it happen in every case or will
13  sometimes the debtor be sued if LL1 expires and
14  there's no payment?
15       A    No.  The debtor wouldn't -- The debtor
16  would always get an LL2 if there's no payment.
17       Q    Okay.  That was my question.  Thank
18  you.
19            MR. ZELMAN:  Frankly -- Off the record
20       for one moment.
21            (Discussion off the record)
22            MR. ZELMAN:  We can go back on the
23       record.
24
25
```

S. Guevara                                        47

```
 1  BY MR. ZELMAN:
 2       Q    Okay.  I'm done with this for now.  I
 3  want to go back to the account notes.
 4            Oh, thank you.  I'll put that in there.
 5            I want to go back to the account notes
 6  that have been marked as Plaintiff's Exhibit E.  At
 7  some point in this litigation -- actually at some
 8  point before this litigation was commenced, my client
 9  retained an attorney who contacted PRA; is that
10  correct?
11       A    Yes.  I see third-party representation
12  noted on April 3rd.
13       Q    Is April 3rd the first date that PRA was
14  notified that my client was represented by counsel?
15       A    The first time it's noted here.  I'm not
16  sure when PRA was first notified other than the
17  account notes.
18            MR. ANTHONY:  When you say, Here, you're
19       referring to Exhibit E?
20            THE WITNESS:  Oh, I'm sorry.  Exhibit E.
21            MR. ANTHONY:  And then reference the
22       line.
23            THE WITNESS:  Okay.  It's a note dated
24       April 3rd, 2015, updated by the initials SKW,
25       and it says third-party representation for
```

S. Guevara                                        48

```
 1       Debtor 2 -- or N2.  And the next note says the
 2       same thing.  Third-party representation for
 3       N1, which means Debtor 1.
 4
 5  BY MR. ZELMAN:
 6       Q    And from your review of the account
 7  notes, you don't see any other attorney
 8  representation before that time; is that correct?
 9            MR. ANTHONY:  Of the plaintiff?
10
11  BY MR. ZELMAN:
12       Q    Of the plaintiff obviously.
13       A    Correct.  I don't see any other notes to
14  that effect.
15       Q    Okay.  Now, I can tell you from what's
16  been disclosed in discovery that a collection lawsuit
17  was filed against my clients on April 7, 2015.
18            And my question to you is do you
19  know who was served with that collection lawsuit?
20  Was it the plaintiff's attorney or was it the
21  plaintiffs?
22       A    I don't see that noted here.
23       Q    Would that be somewhere in the
24  collection file?
25       A    It's possible.
```