NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                :
BRACHA POLLAK and DAVID         :
BENELI,                                          :
                                                :
            Plaintiffs,                          :          Civil Action No. 15-4025-BRM-DEA
                                                :
            v.                                   :
                                                :          **OPINION**
PORTFOLIO RECOVERY ASSOCIATES, :
LLC, and JOHN DOES 1-25,            :
                                                :
            Defendants.                      :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are: (1) Plaintiffs Bracha Pollak ("Pollak") and David Beneli's ("Beneli," together with Pollak, "Plaintiffs") Motion for Summary Judgment (ECF No. 50) and Motion to Certify Class (ECF No. 51); and (2) Defendant Portfolio Recovery Associates, LLC's ("PRA") Motion for Summary Judgment. (ECF No 52.) All motions are opposed. (ECF Nos. 53, 54, 55, and 56.) Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below, PRA's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**, Plaintiffs' Motion for Summary Judgment is **DENIED**, and Plaintiffs' Motion to Certify Class is **GRANTED**.

## I.     BACKGROUND

### A.     PRA's Collection Process

PRA purchases debts from original lenders that the creditor is no longer attempting to collect. (PRA's Statement of Undisputed Facts (ECF No. 50-2) ¶ 1.)[1] After PRA purchases the debt, it attempts to recover the debt through various processes and procedures, which include making telephone calls and sending collection letters. (*Id.* ¶ 2.) These initial collection letters do not include language regarding potential litigation. (*Id.* ¶ 3 and Decl. of Susan J. Guevara (ECF No. 50-4) ¶ 6.) If PRA's collection procedures are unsuccessful at this stage, PRA evaluates the individual accounts to determine whether they are appropriate for potential litigation and, if so, the account will be sent to the Litigation Department, where a separate collection process ensues. (ECF No. 50-2 ¶¶ 4-6 and *see* Dep. of Susan J. Guevara (ECF No. 50-3) at 38-41.) If an account is not placed with the Litigation Department, suit is never filed. (ECF No. 50-2 ¶ 7.)

PRA's Litigation Department is a separate department with approximately 280 employees, including 54 attorneys. (*Id.* ¶ 8.) Once an account is transferred to PRA's Litigation Department, PRA attempts to collect the debt through collection letters sent directly from that department. (*Id.* ¶ 9.) The first letter PRA sends is identified as the LL1 Letter, which typically offers certain settlement options to the debtor and provides the debtor with approximately thirty days to respond. (*Id.* ¶¶ 11-12.) If the debtor accepts any of the settlement options in the LL1 Letter, PRA will honor those settlement options. (*Id.* ¶ 13.) However, if no response is received, PRA's Litigation

---

[1] Although Plaintiffs provide their own Statement of Undisputed Facts, they do not respond to PRA's Statement of Undisputed Facts, and Plaintiffs' Statement of Undisputed Facts do not address everything in PRA's Statement of Undisputed Facts. Therefore, the Court will consider the unaddressed statements in PRA's Statement of Undisputed Facts "undisputed for purposes of the motion." Fed. R. Civ. P. 56(e); *see* Fed. R. Civ. P. 56(c).

Department sends a second letter, the LL2 Letter. (*Id.* ¶ 14.) The LL2 Letter is always sent prior to initiating a lawsuit if the debtor failed to respond to the LL1 letter, dispute the amount, or make any payment. (*See* Dep. of Guevara (ECF No. 52-9) at 43-46.) The LL2 Letter offers less favorable settlement terms and a different thirty day deadline by which the debtor must respond. (ECF No. 50-2 ¶ 15.) If the LL2 Letter goes unanswered, the account is referred to an attorney, for the first time, from PRA's Litigation Department who reviews the file prior to initiating a lawsuit. (*Id.* ¶ 16 and Pls.' Statement of Undisputed Facts (ECF No. 52-2) ¶ 20 (stating the first time an account is ever reviewed by an attorney is sixty days after the LL2 Letter is sent out).) Notably, at the time a debtor's account is transferred to the Litigation Department, there has been no determination by an attorney that the account is ready for litigation. (ECF No. 52-2 ¶ 17 and PRA's Resp. to Pls.' Statement of Undisputed Facts (ECF No. 54-2) ¶ 17.)

If a reviewing attorney determines the account is appropriate for litigation, either an attorney employed by PRA or external counsel hired by PRA will file suit. (ECF No. 50-2 ¶ 18.) However, if the debtor accepts the settlement offer in the LL2 Letter, PRA honors that settlement offer. (*Id.* ¶ 17.) "If a debtor disputes the debt after the debt has been transferred to PRA's Litigation Department, PRA's policy is to remove that account from the litigation process while the dispute is pending." (ECF No. 50-4 ¶ 22.)

B. **Pollak's Account**

In 2008, Pollak entered into an agreement for a credit card with U.S. Bank, N.A. ("U.S. Bank"). (ECF No. 50-2 ¶ 19.) Pollak's credit card with U.S. Bank was used to pay for personal and household items, not business expenses. (ECF No. 52-2 ¶ 5 and ECF No. 54-2 ¶ 5.) On August 25, 2014, PRA acquired Pollak's account from U.S. Bank. (ECF No. 50-2 ¶ 20.) Pollak's balance due on his credit card totaled $7,764.23. (*Id.* ¶ 21.) On December 5, 2014, after PRA attempted to

collect the debt through its traditional practices and received no response from Pollak, it transferred the debt to its Litigation Department. (*Id.* ¶ 22.)

On December 8, 2014, PRA's Litigation Department sent Pollak a LL1 Letter. The LL1 Letter stated:

> ### *Account Transferred to Litigation Department*
> Your account has been transferred to the Litigation Department. At this time, no attorney within the Litigation Department has personally reviewed the particular circumstances of your account.
>
> ***Portfolio Recovery Associates wants to help you resolve this account and avoid potential legal action!***

| Single Payment Settlement | 6 Month Payment Plan | 12 Month Payment Plan |
|---|---|---|
| <ul><li>Save **$2,329.27 off** the balance</li><li>Pay **$5,434,96**</li></ul> | <ul><li>Save **$1,941.05 off** the balance</li><li>Pay **$970.53** per month for the next 6 months</li></ul> | <ul><li>Save **$1,552.79 off** the balance</li><li>Pay **$517.62** per month for the next 12 months</li></ul> |

> Your account qualifies for our settlement program. Here are three options for you to choose from:
>
> ***Your first payment must be received in our office no later than 01/05/2015. Your account will be considered "Settled in Full" once we post your final payment.***
>
> Benefits of settling this account by one of the plans as described above:
> - Your debt on this account will be resolved
> - All collection activities on this account will cease
> - You will avoid potential legal action
> - If our company is reporting this account to the three major credit reporting agencies, we will request that our company's trade line be updated to reflect that this account is not settled.
>
> However, if you do not resolve this account any legal action is taken against you, a judgment may ultimately be obtained and our local attorney may take any action that is legally available in your state to collect this debt to enforce any such judgment against you as permitted by state law.

Please contact our office no later than **01/05/2015** by calling during our business hours to discuss how we can work together to resolve this account. We reserve the right to withdraw or modify this offer at a later date if no payments or payment arrangements are made by **01/05/2015**.

. . . .

**We are not obligated to renew this offer.**

(Pollak's LL1 Letter (ECF No. 50-7); *see* ECF No. 50-2 ¶¶ 25-32 and ECF No. 52-2 ¶ 2.) No attorney in PRA's Litigation Department or otherwise reviewed Pollak's account prior to mailing the LL1 Letter. (ECF No. 50-2 ¶ 24 and ECF No. 52-2 ¶ 19.) Pollak did not respond to or pay any money in response to the LL1 Letter. (ECF No. 50-2 ¶ 33 and ECF No. 52-2 ¶ 3.)

As a result, after the expiration of the settlement options outlined in the LL1 Letter, PRA sent Pollak a LL2 Letter dated January 6, 2015. (ECF No. 50-2 ¶ 34 and ECF No. 52-2 ¶ 3.) No attorney in PRA's Litigation Department or otherwise reviewed Pollak's account prior to mailing the LL2 Letter. (ECF No. 50-2 ¶ 35; ECF No. 52-2 ¶ 19.) The LL2 Letter stated:

> **SECOND NOTICE: Account Transferred to Litigation Department**
>
> Unfortunately, we have not received a response to our recent letter informing you that your account was previously transferred to our Litigation Department. At this time, no attorney within the Litigation Department has personally reviewed the particular circumstances of your account.
>
> **Portfolio Recovery Associates still wants to help you resolve this account and avoid potential legal action!**
>
> We remain willing to settle this account for **$6,211.38** if funds are received in our office by **02/05/2015**.
>
> Benefits of settling this account by this date:
> - Your debt on this account will be resolved
> - All collection activities on this account will cease
> - You will avoid potential legal action

- If our company is reporting this account to the three major credit reporting agencies, we will request that our company's trade line be updated to reflect that this account is not settled.

However, if you do not resolve this account and legal action is taken against you, a judgment may ultimately be obtained and our local attorney may take any action that is legally available in your state to collect this debt to enforce any such judgment against you as permitted by state law.

Please contract our office no later than **02/05/2015** by calling during our business hours to discuss how we can work together to resolve this account. We reserve the right to withdraw or modify this offer at a later date if no payments or payment arrangements are made by **02/05/2015**.

. . . .

***We are not obligated to renew this offer.***

(Pollak's LL2 Letter (ECF No. 50-8); *see* ECF No. 50-2 ¶¶ 36-41 and ECF No. 52-2 ¶ 4.) Pollak did not respond to or pay any money in response to the LL2 Letter. (ECF No. 50-2 ¶ 42.)

On February 17, 2015, Pollak's account was transferred to a PRA attorney for evaluation. (*Id.* ¶ 43.) On April 7, 2015, PRA filed suit in New Jersey state court to collect Pollak's debt, and a default judgment was entered in PRA's favor on May 18, 2015. (*Id.* ¶¶ 44-45.)

### C. Beneli's Account

In 2011, Beneli entered into an agreement for a credit card with Citibank, N.A. ("Citibank"). (*Id.* ¶ 46.) Beneli's credit card with Citibank was used to pay for personal and household items, not business expenses. (ECF No. 52-2 ¶ 10 and ECF No. 54-2 ¶ 10.) On October 20, 2014, PRA acquired Beneli's account from Citibank. (ECF No. 50-2 ¶ 47.) Pollak's balance due on his credit card totaled $2,946.49. (*Id.* ¶ 48.) On March 5, 2015, after PRA attempted to collect the debt through its traditional practices and received no response from Beneli, it transferred the debt to its Litigation Department. (*Id.* ¶ 49.)

On March 9, 2015, PRA's Litigation Department sent Beneli a LL1 Letter. Beneli's LL1 Letter mirrors Pollak's save the three settlement program options and the dates by which to settle the account. (Beneli's LL1 Letter (ECF No. 50-10).) Beneli was offered:

| Single Payment Settlement | 6 Month Payment Plan | 12 Month Payment Plan |
|---|---|---|
| • Save **$883.95 off** the balance<br>• Pay **$2,062.54** | • Save **736.63 off** the balance<br>• Pay **$368.31** per month for the next 6 months | • Save **$589.33 off** the balance<br>• Pay **$196.43** per month for the next 12 months |

(*Id.*) No attorney in PRA's Litigation Department or otherwise reviewed Beneli's account prior to mailing the LL1 Letter. (ECF No. 50-2 ¶ 51 and ECF No. 52-2 ¶ 19.) Beneli did not respond to or pay any money in response to the LL1 Letter. (ECF No. 50-2 ¶ 60 and ECF No. 52-2 ¶ 8.)

As a result, after the expiration of the settlement options outlined in the LL1 Letter, PRA sent Pollak a LL2 Letter dated April 7, 2015. (ECF No. 50-2 ¶ 61 and ECF No. 52-2 ¶ 8.) No attorney in PRA's Litigation Department or otherwise reviewed Beneli's account prior to mailing the LL2 Letter. (ECF No. 50-2 ¶ 62 and ECF No. 52-2 ¶ 19.) Beneli's LL2 Letter mirrors Pollak's LL2 Letter save the amount for which to settle the account and the settlement date. (Beneli's LL2 Letter (ECF No. 50-13).)[2] Beneli did not respond to or pay any money in response to the LL2 Letter. (ECF No. 50-2 ¶ 69.)

On May 14, 2015, Beneli's account was transferred to a PRA attorney for evaluation. (*Id.* ¶ 70.) On June 15, 2015, prior to PRA filing a suit against Beneli, Beneli disputed his debt with PRA. (*Id.* ¶ 71.) Therefore, PRA refrained from filing suit against Beneli until the dispute was

---

[2] The LL1 Letters and LL2 Letters mailed to Plaintiffs are standard template letters used by PRA in contacting all debtors. (ECF No. 52-2 ¶¶ 11-12 and ECF No. 54-2 ¶¶ 11-12.)

resolved.  (*Id.* ¶¶ 71-72.) After the dispute was resolved, but before PRA filed suit against Beneli, Beneli filed suit against PRA. (*Id.* ¶ 73.)

### D.    Facts Relating to Class Certification

Plaintiffs seek to certify two separate classes, defined as:

- Class A: All New Jersey consumers (1) who received a 'LL1' template collection letter from [PRA] similar to the annexed Exhibit A, (2) on an obligation owed or allegedly owed to U.S. Bank, (3) during the time period of June 9, 2014 to the present.

- Class B: All New Jersey consumers (1) who received a 'LL1' template collection letter from [PRA] similar to the annexed Exhibit C, (2) on an obligation owed or allegedly owed to Citibank N.A., (3) during the time period of March 9, 2015 to the present.

(ECF No. 51-1 at 10.) PRA acknowledges it mailed the LL1 Letter to 731 individuals encompassed within Class A and 5,980 individuals encompassed within Class B. (PRA's Second Supp. Resp. to Pls.' Interrogatories (ECF No. 51-8 at 5-6.)

### E.    Procedural History

On June 15, 2015, Pollak filed a putative class action on behalf of herself and all U.S. Bank debtors residing in New Jersey who received LL1 Letters, alleging PRA violated the Fair Debt Collection Practices Act 15 U.S.C. § 1692e *et seq.* ("FDCPA"). (Compl. (ECF No. 1).) Beneli commenced a separate putative class action on March 9, 2016, on behalf of himself and all Citibank debtors residing in New Jersey who received LL1 Letters, alleging PRA violated the FDCPA. (Docket No. 16-1328, ECF No. 1.) On August 22, 2016, the matters were consolidated. (ECF No. 33.) On September 2, 2016, Plaintiffs filed a joint Amended Complaint. (Am. Compl. (ECF No. 34).) On April 4, 2017, Plaintiffs and PRA filed motions for summary judgment. (ECF Nos. 50

and 52.) Both motions are opposed. (ECF Nos. 54, 55, and 56.) On that same date, Plaintiffs filed a Motion to Certify Class. (ECF No. 51.) PRA opposes this Motion. (ECF No. 53.)

## II.    SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## B.    FDCPA Claims

Congress enacted the FDCPA in 1977 as a result of the abundance "evidence of the use of abusive, deceptive, and unfair debt collection practices" and the inadequacy of existing laws and procedures designed to protect consumers. 15 U.S.C. § 1692(a), (b). At the time, Congress was concerned that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to material instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a). The stated purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors" and to promote further action to protect consumers against debt collection abuses. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 174 (3d Cir. 2015) (quoting 15 U.S.C. § 1692(e)). "The right congress sought to protect in enacting this legislation was therefore not merely procedural, but substantive and of great importance." *Blaha v. First Nat'l Collection Bureau*, No. 16-2791, 2016 U.S. Dist. LEXIS 157575, at *23 (D.N.J. Nov. 10, 2016).

"Because the FDCPA is a remedial statute, we construe its language broadly so as to effect its purpose." *Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d Cir. 2011) (citing *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006)). Accordingly, communications from lender to debtors are analyzed from the perspective of the "least sophisticated debtor." *Brown*, 464 F.3d at 454. "The basic purpose of the least-sophisticated [debtor] standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd. This standard is consistent with the norms that courts have traditionally applied in consumer-protection law." *Id.* at 453 (citation omitted).

The "least sophisticated debtor" "prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Wilson v. Quadramed Corp.*, 225

F.3d 350, 354–55 (3d Cir. 2000) (citation omitted). "Even the least sophisticated debtor is bound to read collection notices in their entirety." C*ampuzano–Burgos v. Midland Credit Mgmt.*, 550 F.3d 294, 299 (3d Cir. 2008).

To succeed on an FDCPA claim, a plaintiff must establish: "(1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014); *see also Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015). Only the fourth prong is disputed here. (ECF No. 52-1 at 7; *see* ECF No. 50-1 and ECF No. 56.)

Plaintiffs assert the LL1 Letter violated 15 U.S.C. § 1692e, the provision of the FDCPA dealing with communications from debt collectors to debtors. They claim the LL1 Letter violated three specific subsections: § 1692e(3), (5), and (10). (ECF No. 52-1 at 8.) Specifically, Plaintiffs argue the LL1 letter violated the FDCPA because it "emphasized (1) the involvement of a 'Litigation Department', (2) the need to respond by a stated deadline set 30-day in the future, and (3) the implication that failure to respond by the stated deadline may result in potential legal action." (ECF No. 52-1 at 8.) Therefore, the opinion will only address these issues.

**C.      Whether the LL1 Letter Violates § 1692e(5) and/or (10) by Threatening Immediate Legal Action**

Plaintiffs argue PRA's LL1 Letter violated the FDCPA by setting non-existent deadlines and falsely threatening debtors with imminent legal action if those deadlines were disregarded. (ECF No. 52-1 at 8.) Moreover, they argue PRA never intended to sue any debtor who failed to respond to its LL1 Letter and therefore violated the FDCPA. (*Id.*) PRA argues it did not violate any provision of the FDCPA because the LL1 Letter did not threaten any potential litigation or create a sense of urgency, but instead was just a settlement offer. (ECF No. 50-1 at 15-20.) PRA

further argues it did not violate the FDCPA because it eventually filed suit to collect the debt addressed in its LL1 Letter. (ECF No. 50-1 at 7-14.)

Determining whether PRA's LL1 Letter could reasonably be perceived as a "threat to take legal action" using the "least sophisticated standard" under the circumstances of this case is best left to jury determination. *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1195 (11th Cir. 2010); *see Ideal Dairy Farms, Inc.*, 90 F.3d at 744 ("Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). In the summary judgment context, the burden of persuasion is on the Plaintiffs to prove that no reasonable jury, viewing the letter through the eyes of a "least sophisticated debtor," and making all reasonable inferences in PRA's favor, could find the letter was merely informative or a settlement offer as opposed to threatening. *LeBlanc*, 601 F.3d at 1195.

Section 1692e provides:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> . . . .
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> . . . .
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

A debtor collector violates section 1692(e)(5) where it asserts it could take legal action "it had no intention of taking and has never or very rarely taken before." *Brown*, 464 F.3d at 455. A debt collector also violates the 1692(e)(5) by falsely threatening *imminent* litigation before the decision

whether to sue has been made. *See id.*; *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 63 (2d Cir. 1993); *cf. Newman v. Checkrite Cal., Inc.*, 912 F. Supp. 1354, 1380 (E.D. Cal. 1995) (finding a letter suggesting suit was imminent violated § 1692e(5) because the sender was not in position to file suit imminently). The fact that debtors were eventually sued, "though relevant, is not dispositive. The issue is whether the threat of imminent litigation was true when made." *Nance v. Friedman*, No. 98-6720, 2000 WL 1700156, at *2 (N.D. Ill. Nov. 8, 2000); *see Newman*, 912 F. Supp. at 1380 n.38 ("The fact that [a defendant] did bring suit against [a plaintiff] after this lawsuit was filed does not speak to his state of mind or his ability to sue at the time the letter was sent.")

The Federal Trade Commission's commentary (the "FTC Commentary") to the FDCPA further supports this conclusion. The FTC Commentary observes that a debt collector "may state that a certain action is possible, if it is true that such action is legal and is frequently taken by the collector or creditor with respect to similar debts," but where the debt collector "has reason to know there are facts that make the action unlikely in the particular case, a statement that the action was possible would be misleading." 53 Fed. Reg. 50097, 50106 (1988). "In other words, were it proven that the [debt collector] had reason to know that the legal action described in its letter to [the plaintiff] was unlikely, its statement in the [] Letter that it was possible could be deemed misleading." *Brown*, 464 F.3d at 455.[3]

Therefore, the first issue is whether the LL1 Letter actually contained a threat or imminent threat of litigation in violation of § 1692e(5). The Third Circuit's decision in *Brown*, the Eleventh Circuit's decision in *LeBlanc*, and the Massachusetts District Court in *Waters v. J.C. Christensen & Assocs.*, No. 08-11795, 2011 U.S. Dist. LEXIS 41075 (D. Mass. Mar. 4. 2011) are particularly

---

[3] The FTC Commentary is "not entitled to deference in FDCPA cases except perhaps to the extent [its] logic is persuasive." *Dutton v. Wolpoff & Abramson*, 5 F.3d 649, 654 (3d Cir. 1993).

instructive. In *Brown*, the Third Circuit found the debtor had stated a claim under § 1962e(5) and the District Court had incorrectly dismissed her suit. 464 F.3d at 451. In that case, Card Service Center ("CSC") sent the plaintiff a letter informing her that, unless she made arrangements to pay her debt within five days, the matter "could" result in referral of the account to CSC's attorney, and "could" result in "a legal suit being filed." *Id.* at 451–52. Later, the plaintiff sued, claiming CSC had no intention of referring her account to an attorney and no intention of filing a lawsuit, therefore the letter violated § 1692e's ban on false, misleading, or deceptive communications. *Id.* at 452. The district court dismissed the complaint, determining that because "[t]he letter neither states nor implies that legal action is imminent, only that it is possible," the plaintiff failed to state a § 1692e(5) violation. *Id.* at 454. However, the Third Circuit reversed, concluding:

> Upon reading the CSC Letter, the least sophisticated debtor might get the impression that litigation or referral to a CSC lawyer would be imminent if he or she did not respond within five days. We do not believe that such a reading would be "bizarre or idiosyncratic," *see Quadramed*, 225 F.3d at 354, and we thus conclude that further proceedings are warranted to determine if such a reading is "reasonable" in light of the facts of this case. A debt collection letter is deceptive where "it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Id.* (citation omitted). If [the plaintiff] can prove, after discovery that CSC seldom litigated or referred debts such as [the plaintiff's] and those of the putative class members to an attorney, a jury could conclude that the CSC Letter was deceptive or misleading vis-à-vis the least sophisticated debtor.

*Id.* at 455.

The Third Circuit in *Brown* also made clear that the use of conditional language does not insulate a debt collector from liability. *Id.* at 454-55. This holding is in line with other Circuit Courts. *See Gonzales v. Arrow fin. Servs., LLC*, 660 F.3d 1055, 1062-63 (9th Cir. 2011) ("Conditional language, particularly in the absence of any language clarifying or explaining the conditions, does not insulate a debt collector from liability."); *Leblanc*, 601 F.3d at 1196 (rejecting

a debt collector's reliance on the use of conditional language "in an effort to safeguard the letter from being construed as 'threatening'").

In *Leblanc*, the Eleventh Circuit considered whether, as a matter of law, a dunning letter received from the debt collector's "Legal Department" contained a "threat" to sue the debtor in violation of § 1692e(5) when the collector could not legally pursue the suit. 601 F.3d at 1195-96. In that case, the first paragraph of the letter explained that the debt collector purchased the debtor's debt and provided the particulars of the debt it sought to collect. *Id.* at 1195. The second paragraph included the following critical language:

> If we are unable to resolve this issue within 35 days we may refer this matter to an attorney in your area for legal consideration. If suit is filed and if judgment is rendered against you, we will collect payment utilizing all methods legally available to us, subject to your rights below.

The third paragraph directed the debtor to a website that may be used to "resolve" his account and included instructions for making payments. *Id.* The next paragraph contained the "validation of debt" notice and procedures for disputing the debt required by statute. *Id.* at 1196. The letter also expressly identified itself as a "communication [ ] from a debt collector" and stated "[t]his is an attempt to collect a debt and any information obtained will be used for that purpose." *Id.* The final paragraph stated, "Please feel free to contact us," and provided a telephone number and a website. *Id.* At the bottom of the letter, an asterisk directed the debtor to see the reverse side for "important information regarding [his] rights." *Id.*

The court stated, "read literally, the letter merely advises that legal action is *possible*, that it is *possible* for [the debt collector] to refer the matter to an attorney for consideration, that a lawsuit is only one *possible* outcome or result." *Id.* Therefore, the court reversed summary judgment entered in favor of the debtor on the § 1692e(5) claim, finding "a reasonable juror could

find the dunning letter was more informative than threatening and did not threaten imminent legal action." *Id.* However, the court also denied the debt collector's summary judgment motion, holding "a reasonable juror applying the 'least-sophisticated consumer' standard could also view this letter as either an overt or thinly-veiled threat of suit." *Id.* In doing so, the court rejected the debt collector's argument that the use of "conditional language such as 'if' and 'may' precluded the existence of a threat." *Id.* Even with that language, the Eleventh Circuit found the letter could be read "as intimating that a lawsuit will follow *immediately* after the end of the 35 day 'grace' period," and the court found even "more significant" the fact that the letter shifted "to more forceful language" to the effect that, if a successful lawsuit followed, the collector promised to "*collect payment utilizing all methods legally available*." *Id.* Finally, the court noted that, "although not determinative," the fact that the letter stated that it had originated from the debt collector's "legal department" was yet an added "hint or suggestion of intimidation." *Id.*

In *Waters*, the court granted summary judgment in favor of the debt collector, finding its letters did not violate the FDCPA. 2011 U.S. Dist. LEXIS 41075, *12. In that case, the debt collector sent the debtor three letters in attempt to collect its debt. *Id.* at 8-10. The debtor argued the first and second letter violated § 1692e(10) because

> the clear import of both Letters was that unless the [debtor] settled the Account within a certain period of time, the Account would be forwarded to a Massachusetts attorney for collection. . . . Because the [debtor] did not settle the account within the stated timeframe and the Accounts were not forwarded to an attorney, the letters were deceptive and misleading.

*Id.* at 22. The court did not agree.

The first letter stated, in relevant part:

NOTICE OF LEGAL REVIEW AND SETTLEMENT OPTION

Dear John L Waters,

Our client, RESURGENT CAPITAL SERVICES, has contracted our services to represent them with regard to the Sears account which they now own. RESURGENT CAPITAL SERVICES has prescreened and reviewed your account to be forwarded to an Attorney's office and our client has legal representation in Massachusetts.

Our client has given us authorization to negotiate GENEROUS SETTLEMENT TERMS on their behalf. Please review the following settlement opportunities to make voluntary resolution of your account a reality:

\*\*\*

Take advantage of this opportunity to settle your account and as long as you maintain your payment arrangement, suspend forwarding this account to an Attorney. . . . For accounting purposes, your first payment toward the settlement must be received within 40 calendar days after the date on this letter. If you wish to make a payment proposal after that time, please call us to discuss it. . . .

*Id.* at 7-8. The debtor did not contact the debt collector or take any other action with respect to this letter. *Id.* at 8. Therefore, a second letter was sent, which stated, in relevant part:

NOTICE OF INTENT TO SETTLE

Dear John L Waters,

Our client, RESURGENT CAPITAL SERVICES, has contracted our services to represent them with regard to the Sears account which they now own. We have been unable to work out an agreement with you to resolve this situation. THIS ACCOUNT WILL BE FORWARDED TO AN ATTORNEY in Massachusetts if you do not contact us to resolve this account.

. . . our client is willing to offer you SUBSTANTIAL SAVINGS and FLEXIBLE SETTLEMENT TERMS to attempt to help you voluntarily resolve your account.

\*\*\*

Take advantage of this opportunity to settle your account and as long as you maintain your payment arrangement, suspend forwarding this account to an Attorney. . . . For accounting purposes, your first

> payment toward the settlement must be received within 30 calendar days after the date on this letter. If you wish to make a payment proposal after that time, please call us to discuss it. . . .

*Id.* at 8-9. Again, no action was taken with respect to the second letter. *Id.* at 9. Therefore, the debt collector sent another collection letter. *Id.* The third letter stated, in relevant part:

> FINAL NOTICE OF LEGAL REVIEW
>
> Dear John L Waters,
>
> Our client, RESURGENT CAPITAL SERVICES, has contracted our services to represent them with regard to the Sears account which they now own. We have been unable to work out an agreement with you to resolve this situation. RESURGENT CAPITAL SERVICES has advised us that THIS ACCOUNT WILL BE FORWARDED TO AN ATTORNEY in the state of Massachusetts if you do not contact us to resolve this account.
>
> If you are unable to pay your account in full, our client is willing to offer you SUBSTANTIAL SAVINGS AND FLEXIBLE SETTLEMENT TERMS to attempt to help you voluntarily resolve your account. . . .
>
> Take advantage of this opportunity to settle your account and as long as you maintain your payment arrangement, suspend forwarding this account to an Attorney. . . . For accounting purposes, your first payment toward the settlement must be received within 30 calendar days after the date on this letter. If you wish to make a payment proposal after that time, please call us to discuss it.

*Id.* at 9-10. Again, no action was taken with respect to the third letter. *Id.* at 10. Therefore, the account was placed with a law office for collection. *Id.*

The court found the first letter was not deceptive because the caption of the letter informed the debtor the account was undergoing legal review and that the debt collector was making a settlement offer. *Id.* at 24-25. The letter further stated the debt collector had "prescreened and reviewed" the account to be forwarded to an attorney's office, and the record revealed those statements were true. *Id.* at 25. Indeed, the debt collector had already reviewed the account as one

to be forwarded to an attorney and had already retained counsel in Massachusetts. *Id.* The court

also found the letter did not state the settlement offer was a "one-time" offer or that is was "only"

valid for the forty days. *Id.* at 26. The court noted:

> the First Letter leaves the possibility open that an alternative
> settlement arrangement could be made, even after the 40-day period:
> "If you wish to make a payment proposal after that time, please call
> us to discuss it." . . . "Not only would 'the least sophisticated debtor'
> understand that the expiration of a mere 'offer' does not necessarily
> foreclose the possibility of the parties later agreeing to its terms, but
> [t]he practical consequence of holding [offer] letters unlawful would
> be to prohibit settlement offers that are anything but the debt
> collector's best and final offer."

*Id.*

The court also found the second letter was neither false nor deceptive for similar reasons.

*Id.* at 27. "The only material difference between the [f]irst and [s]econd letter is that the [s]econd

letter states that 'THIS ACCOUNT WILL BE FORWARDED TO AN ATTORNEY in

Massachusetts if you do not contact us to resolve this account.'" *Id.* at 27-28. The court found that

"simply because the [debt collector] made one more settlement offer to the [debtor] (by way of the

[t]hird [l]etter) prior to sending the [a]ccount to the Daniels Law Office for collection," did not

render it false or misleading. Indeed, the debt collector forwarded the account to an attorney, and

the second letter did not foreclose the possibility of settlement under different terms or after the

thirty days. *Id.* at 28.

In this case, the parties disagree about the inferences that can be drawn from the LL1 Letter,

more specifically, whether the LL1 Letter threatens potential or immediate litigation. The LL1

Letter begins by stating "***Account Transferred to Litigation Department,***" followed by, "[a]t this

time, no attorney within the Litigation Department has personally reviewed the particular

circumstances of your account." (ECF No. 50-7.) The next sentence, including critical language,

reads: "***Portfolio Recovery Associates wants to help you resolve this account and avoid potential***

***legal action!***" *Id.* Thereafter, the LL1 Letter states the account qualifies for a settlement program, articulates three options to choose from, and states "**[y]our first payment must be received in our office no later than 01/05/2015**." *Id.* Those statements are followed by a list of benefits for settling the account, one of them being to "avoid potential legal action." *Id.* Lastly, the LL1 Letter states:

> However, if you do not resolve this account and legal action is taken against you, a judgment may ultimately be obtained and our local attorney may take any action that is legally available in your state to collect this debt to enforce any such judgment against you as permitted by state law.
>
> Please contact our office no later than **01/05/2015** by calling during our business hours to discuss how we can work together to resolve this account. We reserve the right to withdraw or modify this offer at a later date if no payments or payment arrangements are made by **01/05/2015**.
>
> . . . .
>
> **We are not obligated to renew this offer.**

*Id.*

The Court finds this matter analogous to *LeBlanc*, where reasonable jurors applying the "least sophisticated debtor" standard could disagree as to the inferences to be drawn from PRA's LL1 Letter to the Plaintiffs. Read literally, the letter merely advises that legal action is possible and that legal action is one possible outcome or result if settlement is not achieved. Taking the most literal reading, a reasonable juror could find the LL1 Letter was just a settlement offer and informative and did not threaten potential, let alone immediate legal action. *See Kryluk v. Northland Grp., Inc.*, No. 14-3198, 2014 WL 6676728, at *6 (E.D. Pa. Nov. 25, 2014) (finding that the inclusion of a deadline by which the plaintiff had to send in payments did not create a false sense of urgency that the plaintiff would forego any opportunity to settle if he missed the deadline, but instead, demonstrated the offer was not being held open indefinitely); *Burgess v. Portfolio*

*Recovery Associates, LLC*, No. 16-1463, 2017 WL 2471802, *3-4 (C.D. Cal. Mar. 23, 2017) (finding a collection letter stating "we are not obligated to renew this offer" with a stated deadline to accept the offers to resolve the debt did not create a sense of urgency).

However, the LL1 Letter could also be viewed as a threat of suit or imminent suit. Despite the conditional language, a reasonable juror could read the phrases "potential litigation" and "we are not obligated to renew this offer" in the LL1 Letter as intimating a lawsuit will follow immediately after the deadline articulated in the letter. *See Brown*, 464 F.3d at 454-55 (clarifying that the use of conditional language does not insulate a debt collector from liability); *Gonzales*, 660 F.3d at 1062-63 ("Conditional language, particularly in the absence of any language clarifying or explaining the conditions, does not insulate a debt collector form liability); *Leblanc*, 601 F.3d at 1196 (rejecting a debt collector's reliance on the use of conditional language "in an effort to safeguard the letter from being construed as 'threatening'"). Although the LL1 Letter includes the safe harbor language of "[w]e are not obligated to renew this offer," much like the safe harbor language in *Burgess*, the LL1 Letter also references "potential legal action" on two separate occasions, which contradicts the safe harbor language. (ECF No. 50-7.) Notably, it references "potential legal action" after listing the three settlement options and under the list of reasons why one should settle the account. (*Id.*) Therefore, a reasonable juror applying the "least sophisticated debtor" standard could find that no more settlement offers will follow, but instead a lawsuit will be initiated at the conclusion of the deadlines articulated in the LL1 Letter.

The LL1 Letter also contains more forceful litigation language:

> However, if you do not resolve this account and legal action is taken against you, a judgment may ultimately be obtained and our local attorney may take any action that is legally available in your state to collect this debt to enforce any such judgment against you as permitted by state law.

(ECF No. 50-7.) This portion of the letter can support a reasonable inference that PRA is threatening Plaintiffs with immediate legal action. Lastly, although not dispositive, the letter was also sent from PRA's Litigation Department. Therefore, the issue of whether the LL1 Letter threatened litigation or was simply informative of a settlement is a jury question.

The *Brown* decision is in line with this decision. There, the Third Circuit concluded "the least sophisticated debtor might get the impression that litigation or referral to a [] lawyer would be imminent if he or she did not respond within five days" and that such a reading would not be "bizarre or idiosyncratic." *Brown*, 464 F.3d at 455. Therefore, the court reversed and remanded the matter to determine if such a reading of the letter was "reasonable" in light of the circumstances of that case. *Id.* The Third Circuit further determined that if such an interpretation was reasonable and the debt collector did not litigate or refer debts to an attorney, then one could find the letter was deceptive or misleading. *Id.* Here, because the parties disagree over what inferences can reasonably be drawn from the LL1 Letter, more specifically, whether it is in any way threatening imminent or immediate litigation, the issue shall be decided by a jury.

While the facts of the *Walters* decision are similar, that case is nonetheless distinguishable. In *Walters*, the court found the first and second letters threatened that the debt collector would forward the account to an attorney office, and that the debt collector *intended* to and ultimately did transfer the matter to an attorney's office. *Walters*, 2011 U.S. Dist. LEXIS 41075, *24-28. Here, however, as stated, the Court finds that determining whether PRA's LL1 Letter could reasonably be perceived as a "threat to take legal action" under the "least sophisticated standard" is an issue for the jury to determine because reasonable jurors applying the "least sophisticated debtor" standard could disagree as to the inferences to be drawn from PRA's LL1 Letter to the Plaintiffs. Moreover, PRA did not intend to sue Plaintiffs at the time it sent them the LL1 Letter.

In the alternative, PRA argues:

> [e]ven assuming, arguendo, the settlement offers in the Collection Letters could be construed as a threat to litigate, despite their plain language, the problem with Plaintiffs' approach is PRA actually did sue [] Pollak, and had begun the process to sue [] Beneli but removed his account from the litigation process after he filed a belated dispute of his account.

(ECF No. 56 at 7.) However, this argument fails because PRA did not intend to sue Plaintiffs at the time it issued the LL1 Letter. *Nance*, 2000 WL 1700156, at *2 ("The fact that [the defendant] did in fact sue some debtors . . . , though relevant, is not dispositive. The issue is whether the threat of imminent litigation was true when made."); *see Newman*, 912 F. Supp. at 1380 n.38 ("The fact that [a defendant] did bring suit against [a plaintiff] after this lawsuit was filed does not speak to his state of mind or his ability to sue at the time the letter was sent.").

In *Nance*, the debt collector argued the letters' indication that he had been authorized to file suit was not a violation of the FDCPA because it was true. *Nance*, 2000 WL 1700156, at *2. The court denied the debt collector's motion for summary judgment, stating:

> Even if so, this would not necessarily carry the day for [the debt collector], for the letters do not just say he was authorized to sue; they indicate that a suit is imminent. Falsely threatening imminent litigation when *the decision whether to sue has not been made* violates the FDCPA. The fact that [the debt collector] did in fact sue some debtors (including [the plaintiff]), though relevant, is not dispositive. The issue is whether the threat of imminent litigation was true when made.

*Id.* (emphasis added) (internal citations omitted). In that case, the debt collector stated he had verbal authorization to file suit where necessary, however, his contract with one of the creditors he represented in writing the letters, required express written authorization before he could file suit. *Id.* Because there were material issues of fact as to whether the creditor needed express written authorization, the court denied the debt collector's motion for summary judgment. *Id.*

In *Newman*, the court found the letters sent by the defendants contained a threat of legal action because the letters

> were on stationary [sic] inscribed with its in-house counsel's name and announced that unpaid accounts would be turned over to outside counsel which might result in "damages and court costs." [One of the defendant's] letter to plaintiff [] announced that she had to pay within 10 days "to avoid [a] lawsuit." Finally, [another defendant's] letters stated "[o]ur client had asked us to send you a DRAFT copy of the law suit we prepared against you[,]" and included a sample complaint with defendant attorney Sweat's signature block at the bottom of the page.

*Newman*, 912 F. Supp. at 1379 (internal citations omitted). Moreover, the court further found many of the defendants were incapable of filing suit at the time they mailed the letters or did not intend to file suit at that time. *Id.* at 1380. Many of the letters were signed by non-attorneys, who as a result were not in a position to file suit "NOW." *Id.* Other letters were mailed by defendants who had no intention to personally file suit. *Id.* Therefore, the court found the defendants violated § 1692e(5). *Id.* at 1381.

In *Reed v. Bailey*, No. 88-5297, 1988 U.S. Dist. LEXIS 19456 (N.D. Ala. Aug. 3, 1998), the defendants mailed two collection letters to the plaintiff. The first collection letter

> began with references to "Carl Wayne Myers, D.D.S., P.A.," and to an "amount" of $75.00. The body of the letter advised [the] plaintiff [] that the matter of Myers v. Reed had been placed with [the] defendants for immediate legal action. [The] plaintiff [] was told that she had five days to contact [the] defendants' office and make "satisfactory arrangements for the liquidation of the claim." The letter further informed [the] plaintiff that should she fail to contact the office within five days, defendants would take immediate legal action to protect their client's interests. [The] [p]laintiff was told that her obligation ". . . beats court costs, some of which can be avoided if you act immediately." The letter was typed on the firm's stationery, clearly identifying defendants as attorneys. The bottom of the letter contained a boxed-in notice directing [the] plaintiff to make payments to the attorneys' office.

*Id.* at 2-3. On July 21, 1987, the defendants mailed the second letter, which was also typed on firm stationery, referred to Dr. Myers and the $75.00 debt, and contained the boxed-in notice directing the plaintiff to make payments to the attorneys. *Id.* at 3. However, this letter also contained a sentence stating, "Suit will be filed within 48 hours if you have not taken care of this account." *Id.* On July 29, 1987, the defendants filed suit against the plaintiff. *Id.* The plaintiff then filed suit alleging the defendants violated several provisions of the FDCPA. *Id.* at 4. In part, the plaintiff argued the defendants violated § 1692e(5) by threatening to take legal action within 48 hours of the July 21st letter. *Id.* at 7-8.

The court found the evidence clearly demonstrated the defendants' intent to take the legal action threatened. The court concluded:

> Admittedly the July 21st letter threatened suit in 48 hours and said suit was not filed until July 29th, but the fact remains that defendants did file suit and relatively soon after the above letter was sent. The threat to file suit was in actuality a threat to institute suit "promptly." Surely Congress did not intend to base FDCPA violations on a calculation of hours and days. Given the fact that defendants followed through with the legal action proposed ad did so within a reasonable time, this court concludes that they did "intend" to take the prompt legal action referred to in the letter; therefore there is no violation of § 1692e(5).

*Id.* at 8-9.

Here, much like in *Nance* and *Newman*, not only did PRA not intend to file suit at the time it sent the LL1 Letter, but it was not authorized to file suit at such time. The undisputed evidence demonstrates that if PRA's debtors do not respond to the LL1 Letter, PRA's Litigation Department automatically seconds the LL2 Letter. (ECF No. 50-2 ¶ 14.) The LL2 Letter is always sent prior to initiating a lawsuit if the debtor failed to respond to the LL1 letter, dispute the amount, or make any payment. (*See* ECF No. 52-9 at 43-46.) Only if the LL2 Letter goes unanswered is the account referred to an attorney, who, for the first time, reviews the file prior to initiating a lawsuit. (ECF

No. 50-2 ¶ 16 and ECF No. 52-2 ¶ 20.) Thereafter, a reviewing attorney determines if the account is appropriate for litigation, and either an attorney employed by PRA or external counsel hired by PRA will file suit. (ECF No. 50-2 ¶ 18.) Because PRA intended to mail a LL2 Letter prior to commencing a lawsuit and because no attorney reviewed Plaintiffs' account prior to mailing the LL1 letter, PRA did not intend to and could not file suit at the time it mailed the LL1 Letter. (ECF No. 50-2 ¶¶ 24, 51 and ECF No. 52-2 ¶ 19.) Therefore, the fact that PRA did eventually file suit against Pollak and prepared to initiate suit against Beneli is inapposite. Contrary to PRA's argument, this case is unlike *Reed* because, there, the court found the defendants intended to take the legal action threatened at the time they sent the July 21st letter. *Reed*, 1988 U.S. Dist. LEXIS 19456, at *8-9. PRA had no such intention here when the LL1 Letter was filed.

Accordingly, Plaintiffs' and PRA's motions for summary judgment are **DENIED** as to the issue of whether the LL1 Letter violated the § 1692e(5) by threatening legal action or immediate legal action they did not intend to take. However, the Court finds PRA did not intend to and was not authorized to file a lawsuit at the time it sent the LL1 Letter. Therefore, if the jury determines PRA threatened *any* legal action, it must find PRA violated § 1692e(5).

Because § 1692e(10) "is a catchall-type provision prohibiting '[t]he use of any false representation or deceptive means to collect . . . any debt,'" *Rosenau v. Unifund Corp.*, 539 F.3d 218, 224 (3d Cir. 2008), and Plaintiffs' § 1692e(10) claim is premised on the same language or theories as the § 1692e(5) claim, the analysis of the § 1692e(5) is dispositive. *Grubb v. Green Tree Servicing, LLC*, No. 13-07421, 2014 WL 3696126, at *11 (D.N.J. July 24, 2014); *see Caprio v. Healthcare Revenue Recovery Grp., LLC*, 709 F.3d 142, 155 (3d Cir. 2013) ("Because we have concluded that the District Court committed reversible error by granting judgment on the pleadings as to the § 1692g claim, we must reach the same conclusion with respect to the claim brought

under § 1692e(10).”); *Vasquez v. Gertler & Gertler, Ltd.*, 987 F .Supp. 652, 659 (N.D. Ill. 1997) (wholly resting its finding that defendant did not violate § 1692e on its finding that defendant did not violate § 1692g); *Piciles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 25–26 (2d Cir. 1989) (holding that the “the vagueness of the language” in a notice suggested defendant would take actions it did not intend to take and therefore violated both §§ 1692e(5) and (10)). Accordingly, Plaintiffs’ and PRA’s motions for summary judgment are **DENIED** as to the issue of whether the LL1 Letter violated § 1692e(10) by threatening legal action. However, the Court finds PRA did not intend to and was not authorized to file a lawsuit at the time it sent the LL1 Letter. Therefore, if the jury determines PRA threatened any legal action in their LL1 Letter in violation of § 1692e(5), it must find PRA also violated § 1692e(10). *Grubb*, 2014 WL 3696126, at *11 (concluding that since the Court found Green Tree failed to satisfy the § 1692g requirements, the May 1 Letter, as alleged, also would be considered “deceptive” in violation of § 1692e(10)). *Bicking v. Law Offices of Rubenstein and Cogan*, 783 F. Supp. 2d 841, 845 (E.D. Va. 2011) (concluding that because defendant failed to satisfy § 1692g(a)(4) and (5) requirements, the alleged violations of § 1692g also state a claim under § 1692e(10)).

### D. Whether the LL1 Letter violates § 1692e(10) by Setting a 30-day Deadline to Respond

Plaintiffs argue the LL1 Letter violated the FDCPA by setting non-existent response deadlines. (ECF No. 52-1 at 8.) Specifically, Plaintiffs contend, “In stating that the Plaintiffs could avoid potential legal action if they responded to [PRA] within the arbitrarily set deadline, [PRA] attempted to instill a false sense of urgency in the Plaintiffs, along with the implicit understanding that the Plaintiff[s] may be sued if they did not timely respond.” (*Id.* at 9.) PRA argues the response deadlines in the LL1 Letter were not misleading and did not create a false sense of urgency. (ECF No. 50-1 at 17.) Specifically, PRA argues that where “a collection letter indicates that the terms of

the particular offer may not be renewed after the deadline—e.g., by including the language, 'We are not obligated to renew this offer'—no false sense of urgency under the FDCPA is created." (*Id.* at 18.)

Courts have established that a response deadline violates the FDCPA where it appears the offer is a "'one-time, take-it-or-leave-it offer', when in fact the debt holder is prepared to make other offers after the expiration date." *DeGeorge v. Fin. Recovery Serv., Inc.*, No. 11-04288, 2012 WL 4473229, at *6 (E.D. Pa. Sept. 28, 2012). However, courts have found that if a collection letter contains the language, "[w]e are not obligated to renew this offer", it does not violate the FDCPA, so long as the rest of the language in the collection letter does not contradict that safe harbor language. *Id.* at *6 (including the safe harbor language may ensure the consumer will not perceive the letters as one-time offers); s*ee Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 775 (7th Cir. 2007); *see also Kryluk*, 2014 WL 6676728, at *6 (finding that if the language in the collection letter at issue contradicts the safe harbor language it violates the FDCPA).

Here, the LL1 Letter states, "We are not obligated to renew this offer." However, while the safe harbor language may ensure that a consumer will not perceive an offer as a one-time offer, the language in the LL1 Letter cannot "be contradictory to the safe harbor language." *Kryluk*, 2014 WL 6676728, at *6. Here, as set forth earlier in this opinion, *see* Section II(C), *supra*, a reasonable juror applying the "least sophisticated debtor" standard may find the LL1 Letter threated immediate or imminent litigation, which by default would render it contradictory to the safe harbor language because it implies Plaintiffs would forego any opportunity to settle if they missed the deadline and were sued immediately. Therefore, because the Court has denied Plaintiffs' and PRA's motions as to the issue of whether the LL1 Letter threatens potential litigation or immediate

legal action, Plaintiffs' and PRA's motions for summary judgment as to whether the LL1 Letter violates § 1692e(10) by setting a 30-day deadline to respond is also **DENIED**.

### E. Whether PRA Violated § 1692e(10) by Stating the Account was Transferred to the Litigation Department

In their Amended Complaint, Plaintiffs argue PRA "further violated [§ 16923(10)] by falsely implying the 'price of poker' had gone up because the account was transferred to a litigation department, when in fact the status of the account was no different." (ECF No. 34 ¶ 86.) PRA argues this argument fails because the accounts were transferred to PRA's Litigation Department and the status of the accounts did change. (ECF No. 50-1 at 21.) Plaintiffs do not directly respond to this argument.

Section 1692e(10) prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." "This subsection is a catchall-type provision prohibiting [t]he use of any false representation or deceptive means to collect . . . any debt." *Rosenau*, 539 F.3d at 224. A letter is deceptive when it can reasonably be read to have two or more meanings, one of which is inaccurate or contradictory to another requirement. *Wilson*, 225 F.3d at 354.

The Court finds a reasonable juror applying the "least-sophisticated debtor standard" standard could not find the statements in the LL1 Letter stating, "Account Transferred to Litigation Department," and "Your account has been transferred to the Litigation Department," violate § 16923(10) as a matter of law. Indeed, Plaintiffs' accounts were transferred to PRA's Litigation Department, and the status of their accounts did change. (ECF No. 50-2 ¶¶ 22, 49.) The record demonstrates that, after PRA purchases the debt, it attempts to recover the debt through various processes and procedures, which include making telephone calls and sending collection letters. (*Id.* ¶ 2.) These initial collection letters do not include language regarding potential litigation. (*Id.*

30

¶ 3 and ECF No. 50-4 ¶ 6.) However, if these collection procedures are unsuccessful, PRA evaluates the individual accounts to determine whether they are appropriate for potential litigation and to be sent to the Litigation Department, where a separate collection process ensues. (ECF No. 50-2 ¶¶ 4-6 and *see* ECF No. 50-3 at 38-41.) If an account is not placed with the Litigation Department, then suit will never be filed. (ECF No. 50-2 ¶ 7.) Therefore, the "price of poker" had gone up since the account was transferred to the Litigation Department since litigation was a possibility. Accordingly, PRA's motions for summary judgment is **GRANTED** as to this issue.

### F. Whether the LL1 Letter Violates § 1692e(3) and/or § 1692e(10) by Referencing the Litigation Department

Plaintiffs argue PRA's repeated reference to its "Litigation Department" in the LL1 Letter was a direct violation of § 1692e(3) and § 1692e(10). (ECF No. 55 at 22.) Specifically, Plaintiffs argue, "The LL1 Collection Letters in this action clearly would mislead the least sophisticated consumer that their account was being placed with an attorney for review and determination as to a possible lawsuit." (*Id.*) PRA argues the LL1 Letter does not violate the FDCPA because it accurately discloses that no attorney reviewed the file and the LL1 Letter did originate from PRA's Litigation Department. (ECF No. 50-1 at 22.)

Section 1692e(3) prohibits "[t]he false representation or implication that any individual is an attorney or that any communication is from an attorney." "[A] debt-collection letter can be deceptive under the FDCPA even if it only implies that it is from an attorney." *Rosenau*, 539 F.3d at 224. The phrase "Legal Department" "could imply to the least sophisticated debtor that a lawyer was involved in drafting or sending the letter." *Id.*

In *Rosenau*, the Third Circuit considered whether a collection letter falsely implied it was from a lawyer in violation of §1692e(3) because it was signed by the "Legal Department" of a collection agency even though none of the employees in that department were attorneys. 539 F.3d

218. In that case, the debt collector sent a collection letter to the plaintiff demanding payment on a debt he owed. *Id.* at 219. The letter stated:

> If we are unable to resolve this issue within 35 days we may refer this matter to an attorney in your area for legal consideration. If suit is filed and if judgment is rendered against you, we will collect payment utilizing all methods legally available to us, subject to your rights below. . . . This communication is from a debt collector. This is an attempt to collect a debt. . . .

*Id.* at 220. The letter was signed by the "Unifund Legal Department," which was comprised solely of non-lawyer employees. *Id.* Viewing the letter from the perspective of the least sophisticated debtor, the Third Circuit concluded a debtor receiving the letter might reasonably infer it was from an attorney even though no attorney worked in that department. *Id.* at 223. The court rejected the argument that the statement "from a debt collector" nullified the implication that the letter was from an attorney because the categories of "debt collector" and "attorney" are not mutually exclusive. *Id.* Lastly, the court disagreed with the district court's conclusion that the letter could not reasonably be interpreted to be from an attorney just because it stated, "may refer this matter to an attorney in your area for legal consideration." *Id.* The court noted, "Lawyers commonly refer cases to other lawyers who practice where particular debtors are located, and the sentence could reasonably be understood to mean that the lawyer who sent the letter plans to enlist the help of local counsel in order to move the matter forward." *Id.*

Other Circuit Courts have also analyzed the application of § 1692e to debt-collection letters from attorneys. The leading case on whether mass-produced debt-collection letters by an attorney violate the proscriptions of the FDCPA is *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993). *See Lesher*, 650 F.3d at 999. In *Clomon*, a debt collection agency mailed several form collection letters to the plaintiff that were printed on the attorney letterhead of the agency's general counsel and bore his facsimile signature. *Clomon*, 988 F.2d at 1316. Even though the attorney approved the

form of the letters and the procedures according to which those letters were sent, the attorney had no direct involvement in the mailing of the letters. *Id.* at 1317. The Second Circuit held "the use of [the attorney's] letterhead and signature on the collection letters was sufficient to give the least sophisticated consumer the impression that the letters were communications from an attorney." *Id.* at 1320. The court held the letters were false and misleading because they were not "from" the attorney in any meaningful sense of the word. *Id.* In reaching this conclusion, the court found significant the fact that the attorney did not review each debtor's file, did not determine when particular letters should be sent, did not approve the sending of particular letters based upon the recommendations of others, did not see particular letters before they were sent, and did not know the identities of the persons to whom the letters were issued. *Id.*; *see also Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 301 (2d Cir. 2003) (explaining that "[a]lthough there is no dispute that [the defendant law firms] are law firms, or that the letters sent by those firms were 'from' attorneys in the literal sense of that word, some degree of attorney involvement is required before a letter will be considered 'from an attorney' within the meaning of the FDCPA").

The Seventh Circuit reached an identical conclusion regarding a similar letter in *Avila v. Rubin*, 84 F.3d 222 (7th Cir. 1996). There, as in *Clomon*, the plaintiff received a series of mass-produced collection letters printed on the letterhead of a law office and with the signature of an attorney. *Id.* at 225. Although the named attorney had approved the general form letter, he did not personally prepare, sign, or review any of the letters sent to the plaintiff. *Id.* Instead, a "legal assistant collector" produced the letter with assistance from materials produced by an attorney. *Id.* The plaintiff argued these letters violated § 1692e(3) because the letters were not technically "from an attorney." *Id.* at 229. The court agreed and concluded an attorney sending a collection letter

must be directly and personally involved in the mailing of the letters in order for the letters to comply with the FDCPA. *Id.* The Court explained:

> An unsophisticated consumer, getting a letter from an "attorney," knows the price of poker has just gone up. And that clearly is the reason why the dunning campaign escalates from the collection agency, which might not strike fear in the heart of the consumer, to the attorney, who is better positioned to get the debtor's knees knocking.
>
> A letter from an attorney implies that a real lawyer, acting like a lawyer usually acts, directly controlled or supervised the process through which the letter was sent. That's the essence of the connotation that accompanies the title of "attorney." A debt collection letter on an attorney's letterhead conveys authority. Consumers are inclined to more quickly react to an attorney's threat than to one coming from a debt collection agency. It is reasonable to believe that a dunning letter from an attorney threatening legal action will be more effective in collecting a debt than a letter from a collection agency. The attorney letter implies that the attorney has reached a considered, professional judgment that the debtor is delinquent and is a candidate for legal action. And the letter also implies that the attorney has some personal involvement in the decision to send the letter. Thus, if a debt collector (attorney or otherwise) wants to take advantage of the special connotation of the word "attorney" in the minds of delinquent consumer debtors to better effect collection of the debt, the debt collector should at least ensure that an attorney has become professionally involved in the debtor's file. Any other result would sanction the wholesale licensing of an attorney" name for commercial purposes, in derogation of professional standards[.]

*Id.* at 229; *see also Nielsen v. Dickerson*, 307 F.3d 623, 635–38 (7th Cir. 2002) (concluding that collection letters from the defendant attorney violated § 1692e(3) and (10) because the attorney was not meaningfully involved in the decision to send the letters).

However, in 2005, the Second Circuit clarified its holding from *Clomon* to explain that an attorney, acting as a debt collector, could avoid liability by including a clear and prominent disclaimer in its collection letter. *Greco v. Trauner, Cohen & Thomas, LLP*, 412 F.3d 360 (2d Cir.

2005). In *Greco*, the collection letter was printed on the letterhead of "Trauner, Cohen & Thomas, LLP," and stated, in relevant part:

> The firm of Trauner, Cohen & Thomas is a law partnership representing financial institutions in the area of creditors rights. In this regard, this office represents the above named BANK OF AMERICA who has placed this matter, in reference to an original account with [sic] for collection and such action as necessary to protect our client.
>
> *At this time, no attorney with this firm has personally reviewed the particular circumstances of your account.* However, if you fail to contact this office, our client may consider additional remedies to recover the balance due.
>
>     . . . .
>
> Very truly yours,
>
> Trauner, Cohen & Thomas, LLP

*Id.* at 361 (emphasis added). The plaintiff, relying on *Clomon*, claimed Trauner, Cohen & Thomas violated the FDCPA by sending a debt collection letter, signed by the law firm and on law firm letterhead, implying the firm had analyzed the debtor's case and rendered legal advice to the creditor even though it had not. *Id.* at 363. The Second Circuit held the letter did not violate the FDCPA because, unlike the letter at issue in *Clomon*, it letter "included a clear disclaimer explaining the limited extent of [the law firm's] involvement in the collection." *Id.* at 365. The Court explained:

> One cannot, consistent with the FDCPA, mislead the debtor regarding meaningful "attorney" involvement in the debt collection process. But it does not follow that attorneys may participate in this process only by providing actual legal services. In fact, attorneys can participate in debt collection in any number of ways, without contravening the FDCPA so long as their status as attorneys is not misleading. Put another way, our prior precedents demonstrate that an attorney can, in fact, send a debt collection letter without being meaningfully involved as an attorney within the collection process, so long as that letter includes disclaimers that should make clear even to the "least sophisticated consumer" that the law firm or

> attorney sending the letter is not, at the time of the letter's
> transmission, acting as an attorney.

*Id.* at 364. Because the letter in *Greco* included a disclaimer stating, "At this time, no attorney with this firm has personally reviewed the particular circumstances of your account," the court concluded the letter did not make a "false representation or implication that any individual is an attorney or that any communication is from an attorney with meaningful involvement as an attorney in the debtor's case." *Id.* at 365 (citation omitted).

The Third Circuit adopted *Greco*'s holding in *Lesher.* In *Lesher*, the Kay Law firm sent a letter to the plaintiff seeking to recover a debt he owed. 650 F.3d at 995. The letter was presented on Kay Law Firm's letterhead and displayed the words "Law Offices of Mitchell N. Kay, P.C." at the top of the page. *Id.* The letter further stated, "Please be advised that your account, as referenced above, is being handled by this office." *Id.* On the back, the letter sets forth four "notices," including, "At this point in time, no attorney with this firm has personally reviewed the particular circumstances of your account." *Id.* Contrary to *Greco*, the Third Circuit in *Lesher* held "the [disclaimer] statement, [located on the back of the letter], that '[a]t this point in time, no attorney with this firm has personally reviewed the particular circumstances of your account' [did] little to clarify the [defendant law firm's] role in collecting the debt because it completely contradicts" the body of the "message sent on the front of the collection letters—that the creditor retained a law firm to collect the debt." *Id.* at 1003. The *Lesher* Court "recognize[d] that the Second Circuit held in *Greco* that" similar language in a "disclaimer sufficiently explained the limited role that attorneys played in collecting the plaintiff's debt." *Id.* at 1003 n.11 (citing *Greco*, 412 F.3d at 366). However, unlike the collection letter in *Greco* where "the disclaimer was part of the body of the text on the front page," the disclaimer in *Lesher* "was printed on the back of the letters." *Id.* at 1002, 1003 n.11 (citing *Greco*, 412 F.3d at 366). Therefore, the court was "not convinced that this

disclaimer . . . effectively mitigated the impression of attorney involvement." *Id.* at 1003 n.11 (citing *Greco*, 412 F.3d at 366).

Here, Plaintiffs argue PRA's references to "Litigation Department" in the LL1 Letter was a direct violation of § 16923(3) and § 16923(10) because it misleads the least sophisticated consumer into believing their account was being placed with an attorney for review. (ECF No. 55 at 22.) Indeed, the LL1 Letter references "Litigation Department" three times at the beginning of the letter. However, it also includes a disclaimer, which mirrors the *Greco* and *Lesher* disclaimers. It states, "At this time, no attorney within the Litigation Department has personally reviewed the particular circumstances of your account." (ECF No. 50-7.)

Contrary to the *Greco* and *Lesher* letters, the LL1 Letter was not signed by an attorney or printed on attorney letterhead. Further, contrary to the *Lesher* disclaimer, but similar to the *Greco* disclaimer, the LL1 Letter disclaimer appears on the front of the letter, in the body of the text. (*See* ECF No. 50-7.) Therefore, the Court finds that by printing the disclaimer on the front, PRA sufficiently clarified any potential confusion noted by the *Lesher* court creating a false representation or implication that an attorney or that any communication from an attorney was involved in the debtor's case. *Stokes v. Farrell Law Grp., LLC*, No. 11-6747, 2012 WL 1455239, at *3 (D.N.J. Apr. 26, 2012) (finding that the use of the *Greco* disclaimer effectively mitigated any incorrect impression of attorney involvement); *Eddis v. Midland Funding, L.L.C.*, No. 11-3923, 2012 WL 664812, at *8 (D.N.J. Feb. 28, 2012) ("Additionally, since [the d]efendant's disclaimer appears on the front of the letter, in the body of the text and in the same font, [the d]efendant has not made a false representation or implication that the letter is from an attorney with meaningful involvement as an attorney in the debtor's case.") Plaintiffs have failed to point to any other characteristics of the LL1 Letter, other than its references to "Litigation Department," which are

likely to confuse or mislead the least sophisticated debtor as to the level of attorney involvement. Moreover, the LL1 Letter did in fact originate from PRA's Litigation Department, and that reference alone does not violate § 16923(10). (*See* ECF No. 50-2 ¶ 9 (stating that once an account is transferred to PRA's Litigation Department, PRA attempts to collect the debt through collection letters sent directly from that department).)

Accordingly, PRA's Motion is **GRANTED** and Plaintiffs' Motion for Summary Judgment is **DENIED** as to the issue of whether PRA violated § 1692e(3) by referencing the "Litigation Department." Because the Court finds PRA did not violate § 1692e(3), it must reach the same conclusion with respect to the claim brought under § 1692e(10), since Plaintiffs' claims are based upon the same facts and theories. *Grubb*, 2014 WL 3696126, at *11.

## III.    CLASS CERTIFICATION

### A.    Standard of Review

The Third Circuit has consistently observed that "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." *In re Comm. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir. 1995) (alterations omitted). Rule 23 contains two sets of requirements. First, a party seeking class certification must demonstrate the class satisfies the requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a).

Second, plaintiffs must show that the requirements of one of the provisions of Rule 23(b) are met. Because Plaintiffs here seek certification under Rule 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are known as predominance and superiority. *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009).

Importantly, the Third Circuit has instructed that "each Rule 23 component [must] be satisfied" in order for a court to certify a class. *In re Hydrogen Peroxide*, 552 F.3d 305, 310 (3d Cir. 2008) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 630 (1997). In that regard, "[c]lass certification is an especially serious decision, as it 'is often the defining moment in class actions (for it may sound the 'death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle [non-meritorious] claims on the part of defendants)." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001). In *Hydrogen Peroxide*, the Third Circuit urged district courts, where appropriate, to "'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.' " 552 F.3d at 316 (quoting *Newton*, 259 F.3d at 167). "An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met." *Id.* Importantly, the predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since "the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Id.* at 310-11 (citations omitted). "'If proof of the essential elements of the cause of action requires individual treatment,'" then predominance is defeated and a class should not be certified. *Id.* (quoting *Newton*, 259 F.3d at 172); *see In re Constar*, 585 F.3d at 780.

## B.      Ascertainability

Before addressing Rule 23's requirements for class certification, PRA, as a preliminary matter, argues Plaintiffs' proposed class, as defined, is overbroad and unascertainable. (ECF No. 53 at 8-17.) Specifically, PRA argues Plaintiffs' proposed class is overbroad and not ascertainable because the proposed class definition does not take into account PRA's intent to file suit. (*Id.* at 13.) PRA argues "[m]erely receiving one or both Collection Letters is insufficient for each punitive class member to establish a claim; rather, Plaintiffs must offer evidence to show that PRA never intended to bring suit against each putative class member at the time the Collection Letters were sent." (*Id.*) According to PRA, the Court "must analyze with respect to each individual putative class member whether PRA ultimately intended to sue the debtors to whom the debt collection letters were sent." (*Id.*) Plaintiffs further assert "once this subjective element of PRA's intent is added to Plaintiffs' class definitions, their request for certification fails because thousands of mini-trials would be required to determine PRA's specific intent with respect to each individual class member. (*Id.* at 16.) The Court disagrees.

Prior to determining whether the requirements of Rule 23 have been met, the Court must first analyze whether Plaintiffs' proposed class definition is "readily ascertainable based on objective criteria." *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 478 (D.N.J. 2009). In order to determine whether a proposed class is ascertainable, the Court must engage in a two part analysis. First, the Court must determine whether the defined class specifies "a particular group that was harmed during a particular time frame, in a particular location, in a particular way." *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 455 (D.N.J. 2009). Second, the Court must be able to ascertain the class's membership in an objective manner. *Id.*; *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (finding the Third Circuit has implemented a two-fold inquiry requiring a plaintiff to show: "(1) the class is defined with reference to objective criteria; and (2)

there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition")

Significantly, in demonstrating ascertainability, a plaintiff need not identify every class member at the class certification stage; instead a plaintiff is required to show that "class members can be identified." *Byrd*, 784 F.3d at 163 (citation omitted) (emphasis in original). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

Here, Plaintiffs have satisfied the requirement of defining an ascertainable class. Plaintiffs' classes definitions are comprised of objective criteria and factors, and, therefore, are capable of being ascertained. Plaintiffs' have proposed the following definitions of the classes:

- Class A: All New Jersey consumers (1) who received a 'LL1' template collection letter from [PRA] similar to the annexed Exhibit A, (2) on an obligation owed or allegedly owed to U.S. Bank, (3) during the time period of June 9, 2014 to the present.

- Class B: All New Jersey consumers (1) who received a 'LL1' template collection letter from [PRA] similar to the annexed Exhibit C, (2) on an obligation owed or allegedly owed to Citibank N.A., (3) during the time period of March 9, 2015 to the present.

(ECF No. 51-1 at 10.) These definitions identify a particular group, New Jersey consumers; a particular time frame; and the harm to the group, receiving the LL1 Letter. As discussed above in the Motion for Summary Judgment section, *supra*, receiving the LL1 Letter is indeed the harm that is the basis of Plaintiffs' FDCPA allegations in this case.

PRA can be held liable under the FDCPA if it did not intend to sue the recipient of the collection letter or falsely threatened *imminent* litigation when the decision whether to sue has not been made also violates the FDCPA. *See Brown*, 464 F.3d at 455; *Bentley*, 6 F.3d at 63; *Newman*,

912 F. Supp. at 1380. The fact that debtors were sued, "though relevant, is not dispositive. The issue is whether the threat of imminent litigation was true when made." *Nance*, 2000 WL 1700156, at *2; *see Newman*, 912 F. Supp. at 1380 n.38.

Because the Court has found that not only did PRA not intend to file suit at the time it sent its LL1 Letters, but it was not authorized to file suit at such time, the harm itself was sending the LL1 Letter. The undisputed evidence demonstrates that once an account is transferred to the Litigation Department, an LL1 Letter is automatically sent. *(*ECF No. 50-2 ¶¶ 11-12.) Notably, at the time a debtor's account is transferred to the Litigation Department, there has been no determination by an attorney that the account is ready for litigation. (ECF No. 52-2 ¶ 17 and ECF No. 54-2 ¶ 17.) If PRA's debtors do not respond to the LL1 Letter, PRA's Litigation Department automatically seconds the LL2 Letter. (ECF No. 50-2 ¶ 14.) The LL2 Letter is always sent prior to initiating a lawsuit if the debtor failed to respond to the LL1 letter, dispute the amount, or make any payment. (*See* ECF No. 52-9 at 43-46.) Only if the LL2 Letter goes unanswered is the account referred to an attorney, who, for the first time, reviews the file prior to initiating a lawsuit. (ECF No. 50-2 ¶ 16 and ECF No. 52-2 ¶ 20.) Thereafter, a reviewing attorney determines whether or not the account is appropriate for litigation, and either an attorney employed by PRA or external counsel hired by PRA will file suit. (ECF No. 50-2 ¶ 18.) Because PRA intended to file a LL2 Letter if Plaintiffs' did not respond to the LL1 Letter and no attorney reviewed either Plaintiffs' account prior to mailing the LL1 letter, PRA did not intend to and could not file suit at the time it mailed the letter. (ECF No. 50-2 ¶ 24, 51; ECF No. 52-2 ¶ 19.) The fact that PRA did eventually file suit against Pollak and prepared to initiate suit against Beneli is inapposite. Therefore, "mini-trials" to determine PRA's subjective intent for each proposed plaintiff are unnecessary. Accordingly, the class definitions are not overbroad or unascertainable.

Plaintiffs' have demonstrated an objective way to ascertain who is a member of the class. Indeed, during discovery, PRA admitted it mailed the LL1 Letter to 731 individuals encompassed within Class A and 5,980 individuals encompassed within Class B. (ECF No. 51-8 at 5-6.) Thus, PRA is capable of ascertaining the putative class members, as demonstrated by its own admission.

### C.      Rule 23(a) Inquiry

The Court first determines whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a). Similar to PRA's ascertainability argument, PRA argues Plaintiffs cannot prove the elements of Rule 23 because PRA's intent to initiate a lawsuit is an individualized question incapable of generating the requisite class-wide answers. (ECF No. 53 at 17-28.)

### i.      Numerosity

With respect to numerosity, a party need not precisely enumerate the class members to proceed as a class action. *In re Lucent Tech. Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 640 (D.N.J. 2004). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice S 23.22[3][a] (Matthew Bender 3d ed. 1999)).

Here, PRA admits to having mailed the LL1 Letter to 731 individuals encompassed within Class A and 5,980 individuals encompassed within Class B. (ECF No. 51-8 at 5-6.)  In light of this concession, it appears the potential number of plaintiffs far exceeds the number generally deemed to satisfy the numerosity requirement. *See Marcus*, 687 F.3d at 595. Therefore, the Court finds numerosity is met.

### ii. Commonality

Commonality requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The threshold for establishing commonality is straightforward: "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Indeed, as the Third Circuit pointed out, "[i]t is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a)(2)." *In re Schering Plough*, 589 F.3d at 97 n.10. Thus, there is a low threshold for satisfying this requirement. *Newton*, 259 F.3d at 183; *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (highlighting that the threshold of commonality is not high (citations omitted)).

Moreover, this requirement does not mandate that all putative class members share identical claims, *see Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988), and that "factual differences among the claims of the putative class members do not defeat certification." *Baby Neal*, 43 F.3d at 56. In that regard, class members can assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice. *Hassine*, 846 F.2d at 177-78. "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded." *Baby Neal*, 43 F.3d at 56.

This case presents numerous questions of law and fact that are common to all class members, as demonstrated by the motions for summary judgment, as each member received an identical LL1 Letter from PRA. Insofar as Plaintiffs allege the LL1 Letter violated the FDCPA, those violations and related remedies would apply to all class members.

### iii. Typicality

Rule 23(a)(3) requires that the representative's claim be typical of those of the members of the class. "The concepts of commonality and typicality are broadly defined and tend to merge, because they focus on similar aspects of the alleged claims." *Newton*, 259 F.3d at 182. "Both criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." *Baby Neal*, 43 F.3d at 56; *see Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Despite their similarity, commonality–like numerosity–evaluates the sufficiency of the class itself, and typicality–like adequacy of representation–evaluates the sufficiency of the named plaintiff. *See Hassine*, 846 F.2d at 177 n.4; *Weiss v. York Hosp.*, 745 F.2d 786, 810 (3d Cir. 1984), *cert. denied*, 470 U.S. 1060 (1985).

Specifically, Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims of the class." *See* Fed. R. Civ. P. 23(a)(3). Typicality acts as a bar to class certification only when "the legal theories of the named representatives potentially conflict with those of the absentees." *Georgine v. Amchem Prods.*, 83 F.3d 610, 631 (3d Cir. 1996); *Newton*, 259 F.3d 183. "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id.* at 184. In other words, the typicality requirement is satisfied as long as representatives and the class claims arise from the same event or practice or course of conduct and are based on the same legal theory. *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 146 (D.N.J. 1999).

Here, typicality is clearly satisfied since Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other class members, namely the LL1 Letter, and are based on the same legal theory. Thus, the typicality requirement of Rule 23(a)(3) is met.

### iv.    Adequacy

A class may not be certified unless the representative class members "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Rule 23(a)'s adequacy of representation requirement 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 343 (3d Cir. 2010) (quoting *Amchem*, 521 U.S. at 625). Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citation omitted).

This requirement has traditionally entailed a two-pronged inquiry: first, the named plaintiff's interests must be sufficiently aligned with the interests of the absentees; and second, the plaintiff's counsel must be qualified to represent the class. *Gen. Motors*, 55 F.3d at 800. A named plaintiff is "adequate" if his interests do not conflict with those of the class. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 312 (3d Cir. 1998). Pursuant to Rule 23(g), adequacy of class counsel is considered separately from the determination of the adequacy of the class representatives. Both prongs of the adequacy requirement are satisfied here.

Plaintiffs have no interests that are antagonistic to those of the members of the proposed class and have no unique defenses from the proposed class. As explained, the fact that some members of the class were in fact sued is inapposite because PRA did not intend to file suit at the time it issued the LL1 Letter. Plaintiffs are alleged to have suffered injury in the same manner as other class members as a result of PRA's alleged violations of the FDCPA. Plaintiffs are therefore an adequate representative of the class.

Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court must consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex

litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. *Nafar v. Hollywood Tanning Sys., Inc.*, No. 06-CV-3826 DMC, 2008 WL 3821776, at *7 (D.N.J. Aug. 12, 2008). Lead Counsel, Marcus & Zelman, LLC, is experienced in handling complex litigation and has represented debtors in over 350 FDCPA cases in the Stated of New York, New Jersey and Connecticut. (*See* ECF No. 51-1 at 15-16.) Accordingly, counsel are qualified and experienced in consumer action litigation and more than adequate to represent Plaintiffs and the class.

### D.     Rule 23(b)(3) Factors: Common Questions Predominate and the Class Is Superior to Other Methods of Adjudication

After meeting the threshold requirements of Rule 23(a), a plaintiff must establish the proposed class meets the requirements of Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court must find that "the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In this case, both considerations weigh in favor of class certification.

Here, Plaintiffs satisfy the predominance and superiority criteria of Rule 23(b)(3). In determining whether common questions predominate, courts have focused on the claims of liability against defendants. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977); *Smith v. Suprema Specialties, Inc.*, No. 02-168, 2007 WL1217980, at * 9 (D.N.J. 2007) (citations omitted) ("The focus of the predominance inquiry is on liability, not damages."). When common questions are a significant aspect of a case and they can be resolved in a single action, class certification is

appropriate. *See* 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, § 1788, at 528 (1986).

In this FDCPA action, PRA's alleged liability arises from issuance of the LL1 Letter. Whether the LL1 Letter violated the FDCPA is the central issue in this case and predominates over any individual issue. Here, the existence of common questions and their predominance over individual issues are exemplified by the fact that if every class member were to bring an individual action, each plaintiff would be required to demonstrate the LL1 Letter violated the FDCPA. The Court finds, therefore, the predominance criteria of Rule 23(b)(3) are met.

The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co.*, 148 F.3d at 316 (internal citations omitted); *In re Warfarin*, 391 F.3d at 532-33. In this case, a class action is appropriate because it would be more efficient to try these plaintiffs together, when compared to other means of adjudication. Accordingly, Plaintiffs' Motion to Certify Class is **GRANTED**.

## IV.    NOTICE TO CLASS

Rule 23(c)(2)(B) requires that the members of a Rule 23(b)(3) class, as in this case, be given notice of the nature of the action, the definition of the class certified, the opportunity to opt out of the class and mechanism for doing so, and other important information that is "clearly and concisely state[d]" in "plain, easily understood language." Fed. R. Civ. P. 23(c)(2)(B). Such notice must be given to all persons who can be identified through reasonable effort. *Id.* In the present case, such notice must now be proposed by class counsel, for Court approval, to apprise the individuals in this class regarding their rights and options.

It also appears a second component of notice to the class is necessary at this time, in light of the fact that Plaintiffs' Motion for Summary Judgment has been denied and PRA's Motion for Summary Judgment has been granted in part and denied in part. Such notice regarding the conduct of the action is permitted in the Court's discretion under Rule 23(d)(1)(B) and will be required here within the forthcoming Rule 23(c)(2)(B) notice.

Accordingly, counsel shall confer regarding the approval form of class notice, and class counsel, within thirty (30) days of entry of the accompanying Order, shall submit an appropriate motion for approval of class notification for the Court's approval.

## V.    CONCLUSION

For the reasons set forth above: (1) Plaintiffs' and PRA's motions for summary judgment are **DENIED** as to the issue of whether the LL1 Letter violated § 1692e(5) and § 1692e(10) by threatening imminent or immediate legal action; (2) Plaintiffs' and PRA's motions for summary judgment as to whether the LL1 Letter violates § 1692e(10) by setting a 30-day deadline to respond is **DENIED**; (3); PRA's Motion is **GRANTED** and Plaintiffs' Motion for Summary Judgment is **DENIED** as to the issue of whether PRA violated § 1692e(3) and § 1692e(10) by referencing the "Litigation Department"; (4) PRA's Motion is **GRANTED** as to the issue of whether it violated § 1692e(10) by stating the account was transferred to the Litigation Department; and (5) Plaintiffs' Motion to Certify Class is **GRANTED**. Plaintiffs' counsel shall submit an appropriate motion for approval of class notification for the Court's approval within thirty (30) days of entry of the accompanying Order.

**Date:** January 17, 2018                    */s/ Brian R. Martinotti*
                                              **HON. BRIAN R. MARTINOTTI**
                                              **UNITED STATES DISTRICT JUDGE**